**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION**

LAURA SOSH-LIGHTSY,     )
     )
    *Plaintiff,*     )
     )
v.     )
     )   Civil Action No. 3:25-cv-01287
DR. SIDNEY MCPHEE, in his individual ca-   )   Judge Eli J. Richardson
pacity and in his official capacity as President of   )   Magistrate Judge Jeffery S. Frensley
Middle Tennessee State University; DR.   )
DANNY KELLEY, in his individual capacity   )
and in his official capacity as the Interim Vice   )
President for Student Affairs and Dean of Stu-   )
dents of Middle Tennessee State University,   )
     )
    *Defendants.*     )
     )

---

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

---

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    A. Mr. Kirk is publicly murdered. ................................................................ 2

    B. Ms. Sosh-Lightsy celebrates. ................................................................. 3

    C. MTSU terminates Ms. Sosh-Lightsy's employment. ................................ 4

    D. Ms. Sosh-Lightsy files this lawsuit. ....................................................... 6

LEGAL STANDARDS ............................................................................................. 6

ARGUMENT .......................................................................................................... 7

    I. Ms. Sosh-Lightsy Did Not Engage in Protected Conduct. ........................ 7

      A. Ms. Sosh-Lightsy has very little First Amendment interest in her conduct here. ..... 8

      B. MTSU has a substantial interest in avoiding disruption on campus. ...................... 10

      C. MTSU's interest outweighs Ms. Sosh-Lightsy's, so her conduct is not protected by the First Amendment. ................................................................. 15

    II. Even if Ms. Sosh-Lightsy's Conduct Were Protected, That Was Not Clearly Established When MTSU Terminated Her Employment. ........................... 16

CONCLUSION ...................................................................................................... 19

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*,
    793 F.3d 822 (8th Cir. 2015) ................................................................................................ 14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .............................................................................................................. 6

*Barber v. Miller*,
    809 F.3d 840 (6th Cir. 2015) ................................................................................................ 16

*Bd. of Cnty. Commissioners, Wabaunsee Cnty., Kansas v. Umbehr*,
    518 U.S. 668 (1996) .............................................................................................................. 16

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ......................................................................................................... 8, 14

*Bendix Autolite Corp. v. Midwesco Enters., Inc.*,
    486 U.S. 888 (1988) .............................................................................................................. 18

*Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*,
    977 F.3d 530 (6th Cir. 2020) ........................................................................................ *passim*

*Buddenberg v. Weisdack*,
    939 F.3d 732 (6th Cir. 2019) .................................................................................................. 7

*Connick v. Myers*,
    461 U.S. 138 (1983) .............................................................................................................. 15

*Crawford v. Tilley*,
    15 F.4th 752 (6th Cir. 2021) ........................................................................................ 6, 7, 16

*Curran v. Cousins*,
    509 F.3d 36 (1st Cir. 2007) .................................................................................................... 9

*Darlingh v. Maddaleni*,
    142 F.4th 558 (7th Cir. 2025) ................................................................................................. 9

*Davignon v. Hodgson*,
    524 F.3d 91 (1st Cir. 2008) .................................................................................................... 9

*DeCrane v. Eckart*,
    12 F.4th 586 (6th Cir. 2021) ................................................................................... 7, 8, 15, 16

*DeVooght v. City of Warren, Michigan*,
    157 F.4th 893 (6th Cir. 2025) ................................................................................................ 17

*DiMeglio v. Haines,*
  45 F.3d 790 (4th Cir. 1995) .................................................................................. 18

*Garcetti v. Ceballos,*
  547 U.S. 410 (2006) ............................................................................................... 8

*Garvie v. Jackson,*
  845 F.2d 647 (6th Cir. 1988) .................................................................................. 17

*Gillis v. Miller,*
  845 F.3d 677 (6th Cir. 2017) ............................................................................. *passim*

*Grutzmacher v. Howard Cnty.,*
  851 F.3d 332 (4th Cir. 2017) .................................................................................. 10

*Guercio v. Brody,*
  911 F.2d 1179 (6th Cir. 1990) ........................................................................... *passim*

*Gustilo v. Hennepin Healthcare Sys., Inc.,*
  No. 0:22-CV-00352-SRN-DJF, 2025 WL 2539116 (D. Minn. Sept. 4, 2025) ...................... 13

*Hedgepeth v. Britton,*
  152 F.4th 789 (7th Cir. 2025) ................................................................................. 10

*Hussey v. City of Cambridge,*
  720 F. Supp. 3d 41 (D. Mass. 2024) ....................................................................... 10

*Livermore v. City of Petersburg,*
  844 F.3d 400 (4th Cir. 2016) .................................................................................. 10

*Locurto v. Giuliani,*
  447 F.3d 159 (2d Cir. 2006) ................................................................................... 11

*Lyons v. City of Xenia,*
  417 F.3d 565 (6th Cir. 2005) .................................................................................. 11

*Marquardt v. Carlton,*
  No. 21-3832, 2023 WL 395027 (6th Cir. 2023) ................................................... 10, 19

*McElhaney v. Williams,*
  81 F.4th 550 (6th Cir. 2023) .................................................................................. 17

*Myers v. City of Centerville,*
  41 F.4th 746 (6th Cir. 2022) .................................................................................. 19

*Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.,*
  112 F.4th 373 (6th Cir. 2024) ............................................................................ 8, 18

*Pearson v. Callahan,*
  555 U.S. 223 (2009) ............................................................................................... 19

iii

*Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205,*
    391 U.S. 563 (1968) ............................................................................................ *passim*

*Pleasant View Baptist Church v. Beshear,*
    78 F.4th 286 (6th Cir. 2023) .................................................................... 16, 18

*Rankin v. McPherson,*
    483 U.S. 378 (1987) ............................................................................................ *passim*

*Rhodes v. Michigan,*
    10 F.4th 665 (6th Cir. 2021) .................................................................... 17, 18

*Shirinian v. Plowman,*
    No. 3:25-cv-528-KAC-JEM, 2025 WL 3680503 (E.D. Tenn. Dec. 18, 2025).... 10, 11, 14, 19

*Skousen v. Brighton High Sch.,*
    305 F.3d 520 (6th Cir. 2002) .................................................................... 19

*Summers v. Leis,*
    368 F.3d 881 (6th Cir. 2004) .................................................................... 19

*Vanderhoef v. Dixon,*
    938 F.3d 271 (6th Cir. 2019) .................................................................... 16

*Vanderhoef v. Dixon,*
    938 F.3d 271 (6th Cir. 2019) .................................................................... 16

*Waters v. Churchill,*
    511 U.S. 661 (1994) .................................................................................. 15

*Watts v. Fla. Int'l Univ.,*
    495 F.3d 1289 (11th Cir. 2007) ............................................................... 8

*White v. Pauly,*
    580 U.S. 73 (2017).................................................................................... 16

**Statutes**

42 U.S.C. § 1983.................................................................................................... 6, 7

iv

# INTRODUCTION

After an assassin shot and killed Charlie Kirk at Utah Valley University, Plaintiff Laura Sosh-Lightsy went online to celebrate. Ms. Sosh-Lightsy publicly announced on her Facebook page that she had "ZERO sympathy" for Mr. Kirk given his conservative beliefs. In fact, she was glad that Mr. Kirk no longer could advocate his conservative viewpoints. That callous sentiment showed bias irreconcilable with her role at Middle Tennessee State University handling sensitive matters for students of all political stripes, including students who share Mr. Kirk's views. So, when her posts went viral online, MTSU reasonably determined that Ms. Sosh-Lightsy's comments would disrupt effective university operations and terminated her employment. She now claims that MTSU retaliated against her for engaging in conduct protected by the First Amendment and seeks to hold liable Defendants MTSU President Dr. Sidney McPhee and MTSU Interim Vice President for Student Affairs and Dean of Students Dr. Danny Kelley. But Ms. Sosh-Lightsy's claim fails as a matter of law and, in all events, Drs. McPhee and Kelley are entitled to qualified immunity.

To start, Ms. Sosh-Lightsy cannot make out the most basic element of a First Amendment retaliation claim—i.e., that she engaged in protected conduct. For her Facebook posts to be protected by the First Amendment, her interest in celebrating the silencing of Mr. Kirk's viewpoints must outweigh MTSU's interest in avoiding disruption on campus. It does not. At best, Ms. Sosh-Lightsy had only a minimal interest in sharing her callous speech about Mr. Kirk's murder, while Drs. McPhee and Kelley had substantial bases to conclude that her viral comments would disrupt MTSU's operations. Because Ms. Sosh-Lightsy cannot establish that she engaged in protected conduct, she cannot make out a claim for First Amendment retaliation.

Even if the Court disagrees about where the balance of interests settles here, Drs. McPhee and Kelley are still entitled to qualified immunity. That's because state officials are only liable for violations of rights that are clearly established by law. And when MTSU terminated Ms. Sosh-Lightsy's

1

employment, no case clearly established that her interest in celebrating Mr. Kirk's death outweighed MTSU's interest in effective operations. Because reasonable minds could at least debate whether the First Amendment protected Ms. Sosh-Lightsy's conduct, qualified immunity bars her claims against Drs. McPhee and Kelley in their individual capacities.

## BACKGROUND

### A. Mr. Kirk is publicly murdered.

Mr. Kirk was a conservative political commentator and the founder of Turning Point USA. Compl., ECF No. 1 ¶ 4. Turning Point bills itself as "the largest and fastest-growing conservative youth activist organization in America." Turning Point USA, *Our Founder*, https://perma.cc/W2DE-ELYT; *see also* Compl. ¶¶ 4, 29. Its stated mission is to "equip[] the next generation with the tools and knowledge to defend and promote conservative values" on college campuses by promoting "open dialogue and thought[-]provoking discussion" at on-campus events. *See* Turning Point USA Students, *About Us*, https://www.tpusastudents.com/aboutus; *see also* Compl. ¶¶ 29-31, 36. Turning Point has chapters at universities across the country, including at MTSU. Compl. ¶¶ 29, 36.

On September 10, 2025, Mr. Kirk attended a Turning Point event at Utah Valley University. *See id.* ¶ 32. Mr. Kirk set up a stage that day in Utah Valley's outdoor amphitheater and invited citizens with opposing views to debate him on various political and cultural topics. Shortly after Mr. Kirk took his position on stage and readied himself for respectful debate, a gunshot rang out. An assassin's bullet struck Mr. Kirk in front of the large crowd that had gathered to see him. Blood immediately poured from his neck, and he collapsed to the ground.

Chaos ensued. Students and onlookers scattered in panic looking for shelter. Mr. Kirk's security detail rushed to his aid. For a significant time, the public did not know Mr. Kirk's fate or the whereabouts of the shooter.

2

Meanwhile, gruesome videos of the shooting circulated on the internet. Many on social media expressed horror. Allie Beth Stuckey (@conservmillen), X (Sept. 10, 2025, at 3:05 p.m. CT), https://perma.cc/X64L-UZ7N. Others, including the White House, voiced concern about Mr. Kirk's well-being and called for prayers. The White House (@WhiteHouse), X (Sept. 10, 2025, at 2:07 p.m. CT), https://perma.cc/3MLQ-HHN3. But some online offered commentary that was nearly as heartless as the act itself. *See* End Wokeness (@EndWokeness), X (Dec. 11, 2025, at 1:28 p.m. CT), https://tinyurl.com/bvva6hhm. Eventually, President Trump announced that Mr. Kirk had succumbed to his injuries. The White House (@WhiteHouse), X (Sept. 10, 2025, at 3:50 p.m. CT), https://perma.cc/25E9-GEL5.

Troubling commentary about Mr. Kirk's murder continued in the days after his death. For example, political commentator Matthew Dowd suggested that Mr. Kirk was responsible for his own murder, leading MSNBC to terminate Mr. Dowd's contract. *See* Joesph Gedeon, *MSNBC fires analyst Matthew Dowd over Charlie Kirk shooting remarks*, The Guardian (Sept. 11, 2025), https://perma.cc/KEE2-AK99. Major news outlets have reported that experts are concerned that these online celebrations and posts "signal a dangerous mainstream shift in politics," which has become increasingly violent in recent years. Andrew Mark Miller & Charles Creitz, *Experts warn leftist celebrations of Charlie Kirk's death signal a dangerous mainstream shift in politics*, Fox News (Sept. 19, 2025), https://perma.cc/7E3L-GLPN.

### B. Ms. Sosh-Lightsy celebrates.

The same day that Mr. Kirk was gunned down, Ms. Sosh-Lightsy took to Facebook to "celebrat[e]." *See* Compl. ¶ 44. At first, she posted to her account that it "[l]ooks like ol' Charlie spoke his fate into existence. Hate begets hate. ZERO sympathy." *Id.* ¶ 43. She followed up fourteen minutes later with a post confirming her stance: "Yep. Hate begets hate. Still no sympathy. You get back what you put into the world tenfold." *Id.* ¶ 44. This message was accompanied by a stock photo of a

3

stream with superimposed text reading, "I'm not celebrating the loss of Charlie Kirk's life. Violence is not the answer. I am celebrating the loss of his message of violence, in an increasingly violent world, which is partially because of him." *Id.* Ms. Sosh-Lightsy made a final post alluding to the "violence" at Utah Valley an hour-and-a-half later. *Id.* ¶ 45.

Ms. Sosh-Lightsy's social media posts went viral. They caught the attention of Matthew Hurtt, an MTSU alum and one of Ms. Sosh-Lightsy's Facebook friends. *Id.* ¶ 46. Mr. Hurtt shared screen-grabs of each of Ms. Sosh-Lightsy's posts on his X account. *Id.* ¶¶ 47-51. The screengrabs garnered significant engagement. Ms. Sosh-Lightsy's post that she had "ZERO sympathy" for Mr. Kirk alone has more than 2.3 million views. *Id.* ¶ 48.

Tennessee Senator Marsha Blackburn was also one of the many people who saw Ms. Sosh-Lightsy's posts. *See id.* ¶ 52. Senator Blackburn shared one of Mr. Hurtt's screengrabs on X with her own commentary that Ms. Sosh-Lightsy "should be ashamed of her post." *Id.* She also stated that Ms. Sosh-Lightsy "should be removed from her position at @MTSU." *Id.* More than 415,000 accounts have viewed Senator Blackburn's post. *See id.*

### C. MTSU terminates Ms. Sosh-Lightsy's employment.

At the time her social media posts celebrating Mr. Kirk's assassination went viral, Ms. Sosh-Lightsy was the Associate Dean of Student Care and Conduct at MTSU. *Id.* ¶¶ 23, 80. In that role, she was responsible for investigating and resolving disciplinary matters involving MTSU students; coordinating student mediation services; providing academic, personal, and social counseling; and investigating and making recommendations regarding students of concern. *See id.* ¶¶ 23-25, 28-30, 60, 80; ECF No. 1-1; *see also* MTSU, *Office of Student Care and Conduct: Our Mission*, https://perma.cc/8PSE-ZNFR. These responsibilities required that Ms. Sosh-Lightsy establish and maintain effective working relationships with diverse constituencies, including students with conservative viewpoints. *See* ECF No. 1-1; Compl. ¶¶ 28-30. But her posts revealed her bias against people who held Mr. Kirk's

4

conservative views, which she called "hate[ful]," "violen[t]," and so contemptable that she felt "ZERO sympathy" for someone who was murdered in cold blood simply for sharing them. *See* Compl. ¶¶ 43-45. Further destroying any appearance of impartiality, Ms. Sosh-Lightsy explicitly "celebrat[ed]" the silencing of her disfavored viewpoints. *Id.* ¶ 44.

Worst of all, Ms. Sosh Lightsy delivered a mixed message about violence. On the one hand, she shared that "[v]iolence is not the answer" *she* would choose for quieting viewpoints she opposes. *Id.* ¶ 44. But, on the other hand, she suggested that violence against people like Mr. Kirk is a natural, expected consequence of their views. According to Ms. Sosh-Lightsy, the allegedly "[h]ate[ful]" and "violen[t]" views that Mr. Kirk held inevitably "begets hate" manifesting "tenfold" opposition—including cold blooded murder. *See id.* Indeed, Ms. Sosh-Lightsy suggested that Mr. Kirk had it coming, so to say, claiming that "ol' Charlie [had] spoke[n] his fate into existence" through his Second Amendment advocacy. *See id.* ¶¶ 36, 43.

MTSU learned of Ms. Sosh-Lightsy's viral social media posts later that same evening. Given her statements, espoused immediately after an incident of extreme political violence on another university campus, MTSU determined that Ms. Sosh-Lighsy could not effectively continue in her position working closely with students. MTSU reasonably feared that students who share Mr. Kirk's views no longer could trust that Ms. Sosh-Lightsy would unbiasedly consider their needs, concerns, or safety. *Id.* ¶¶ 58-60; *see* ECF No. 1-1. Drs. McPhee and Kelley called Ms. Sosh-Lightsy and explained that her online comments had caused MTSU irreparable harm. *Id.* ¶¶ 57-58. They told Ms. Sosh-Lightsy that her posts severely undermined her ability to effectively fulfill her duties at the University. *Id.* ¶ 58. Dr. McPhee informed Ms. Sosh-Lightsy that MTSU was thus terminating her employment immediately. *Id.* ¶ 59.

Dr. Kelley sent an official termination letter the next day. There, Dr. Kelley reiterated that Ms. Sosh-Lightsy's role "oversee[ing] the adjudication of student behavioral matters … requires

5

students and other University community members to see [her] as an objective professional without agendas." ECF No. 1-1. And because of Ms. Sosh-Lightsy's posts, "that perception has been damaged to such an extent" that MTSU determined she "can no longer effectively assess and resolve any student conduct matters, particularly those involving students whose opinions align with Mr. Kirk's." *Id.* Dr. Kelley explained that these comments would cause "disruption and interference with University operations," warranting Ms. Sosh-Lightsy's termination. *See id.*

### D. Ms. Sosh-Lightsy files this lawsuit.

Ms. Sosh-Lightsy filed this suit against Drs. McPhee and Kelley in their respective individual and official capacities alleging a single count under 42 U.S.C. § 1983. Compl. ¶¶ 14-21. According to Ms. Sosh-Lightsy, her Facebook posts celebrating the events at Utah Valley were First Amendment-protected activity and her termination amounted to unlawful retaliation. *Id.* ¶¶ 101-15. Defendants now move to dismiss based on Ms. Sosh-Lightsy's failure to state a claim for First Amendment retaliation and because Drs. McPhee and Kelley are entitled to qualified immunity.

### LEGAL STANDARDS

To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Cranford v. Tilley*, 15 F.4th 752, 762 (6th Cir. 2021). In other words, the plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Courts must draw upon their "judicial experience and common sense" to decide whether the claims are "plausible." *Id.* (quoting *Iqbal*, 556 U.S. at 679). And "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 678).

The "qualified-immunity inquiry" at the motion to dismiss stage has two components. *Id.* First, the facts alleged must make out a violation of a constitutional right. *Id.* Second, that infringed

6

right must have been "clearly established when the event occurred so that a reasonable officer would have known that his conduct violated it." *Id.* (quoting *Buddenberg v. Weisdack*, 939 F.3d 732, 738 (6th Cir. 2019)). Courts may address these inquiries "in any order." *Id.*

## ARGUMENT

Ms. Sosh-Lightsy cannot recover under § 1983 because she can neither establish that she engaged in conduct protected by the First Amendment, nor show that Drs. McPhee and Kelley violated clearly established law. *See DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021); *Guercio v. Brody*, 911 F.2d 1179, 1184 (6th Cir. 1990). Ms. Sosh-Lightsy does not allege a violation of her First Amendment rights, at least not any right that was clearly established when Drs. McPhee and Kelley ended her employment at MTSU. The First Amendment does not protect Ms. Sosh-Lightsy's conduct because her interest in celebrating snuffing out viewpoints she disfavors does not outweigh MTSU's interest in operating effectively, including providing students who share those disfavored viewpoints with a safe environment and unbiased administration. At the very least, Ms. Sosh-Lightsy cannot show that at the time she was fired case law clearly established that the balance of those interests tilted in her favor. To the contrary, precedent demonstrates that Drs. McPhee and Kelley reasonably concluded that the balance of interests favored maintaining efficient and effective university operations. Because Ms. Sosh-Lightsy has failed to state a claim for First Amendment retaliation, the Court should dismiss her Complaint entirely. At minimum, her individual-capacity claims against Drs. McPhee and Kelley are barred by qualified immunity.

## I. Ms. Sosh-Lightsy Did Not Engage in Protected Conduct.

Ms. Sosh-Lightsy alleges that Drs. McPhee and Kelley violated the First Amendment by terminating her because of her posts celebrating the violent silencing of Mr. Kirk's views. To succeed, she must first demonstrate that the First Amendment protects those posts. *DeCrane*, 12 F.4th at 594. But it doesn't. So, her claim fails as a matter of law without further inquiry, and the individual-capacity

7

defendants are entitled to qualified immunity.[1]

The First Amendment does not protect all speech. Public-employee speech must clear three hurdles to arrive within the First Amendment's shelter. *Id.* First, the employee must speak as a private citizen rather than pursuant to the employee's job duties. *Id.* (citing *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006)). Second, the "First Amendment protects this speech only if it addresses a matter of public (rather than private) concern." *Id.* (citation omitted). Third, "the First Amendment protects the speech only if the employee's interest in speaking outweighs the employer's interest in operating— a test that has come to be called '*Pickering* balancing.'" *Id.* (citing *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 568 (1968)).

Here, Ms. Sosh-Lightsy's claim falters on at least the third requirement. She cannot show that her interest in celebrating Mr. Kirk's silencing outweighed MTSU's interest in effective campus operations. So, the First Amendment does not protect her conduct. *See Watts v. Fla. Int'l Univ.*, 495 F.3d 1289, 1293-94 (11th Cir. 2007) (applying *Pickering* to dismiss a plaintiff's free speech claim for failing to state a claim).

### A. Ms. Sosh-Lightsy has very little First Amendment interest in her conduct here.

Ms. Sosh-Lightsy has only a minimal First Amendment interest in her social media posts here. They "referenced a high-profile public event, albeit in a distasteful manner." *See Noble v. Cincinnati & Hamilton Cnty. Pub. Libr.*, 112 F.4th 373, 382 (6th Cir. 2024) (citation modified). And she alleges that she shared them on her own Facebook page outside of work hours. *See* Compl. ¶¶ 40-41. But weighing the competing interests in this case requires considering "the manner, time, … place[,]" and "context" of Ms. Sosh-Lightsy's posts. *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). These factors

---

[1] For purposes of this motion only, Drs. McPhee and Kelley must accept the facts alleged in the Complaint as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). And while they limit their discussion in this motion to whether Ms. Sosh-Lightsy can establish only certain elements of her First Amendment retaliation claim, Drs. McPhee and Kelley preserve their right to challenge in the future whether she can satisfy other necessary elements, *see DeCrane*, 12 F.4th at 593-94.

diminish Ms. Sosh-Lightsy's interest and place a thumb on MTSU's side of the *Pickering* scale.

"Speech done in a vulgar, insulting, and defiant manner is entitled to less weight in the *Pickering* balance," *Darlingh v. Maddaleni*, 142 F.4th 558, 566 (7th Cir. 2025) (quoting *Curran v. Cousins*, 509 F.3d 36, 49 (1st Cir. 2007)), than speech made "in a civil, non-threatening manner," *Davignon v. Hodgson*, 524 F.3d 91, 105 (1st Cir. 2008). Ms. Sosh-Lightsy's posts are very much the former. She did not offer respectful, thoughtful discourse about Mr. Kirk's murder, his views, or the dangers of gun violence more broadly. *See* Compl. ¶¶ 43-44. Rather than appeal to logic, reason, or civility, Ms. Sosh-Lightsy offered inflammatory speech to "celebrat[e] the loss of [Mr. Kirk's] message" and belittle his positions as "hate[ful]," "violen[t]," and contemptable. *See id.* This was clear after Ms. Sosh-Lightsy doubled down on having "ZERO sympathy" for a young father of two who had just been murdered in cold blood because of his conservative viewpoints. *Id.*

Indeed, she suggested that Mr. Kirk's gruesome demise was a natural outgrowth of the views he advanced. According to Ms. Sosh-Lighsy, Mr. Kirk "spoke his [murder] into existence" by advocating for the Second Amendment, and he expectedly "g[o]t back … tenfold" the alleged "[h]ate" he "put into the world" through his advocacy. *Id.* Indeed, Mr. Kirk's allegedly "hate[ful]" views, Ms. Sosh-Lightsy claimed, necessarily "begets hate" and, potentially, violence. *See id.* And she had "no sympathy" when violence resulted. *Id.* This is not "the well-informed" views of a government employee "engaging in civic discussion" that the public has some "interest in receiving." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.*, 977 F.3d 530, 538-39 (6th Cir. 2020).

Ms. Sosh-Lightsy's uncivil, provocative posts also arrived at the wrong time and in the wrong place. They came just hours after Mr. Kirk's violent murder in front of a large crowd on a university campus—emotions still ran high, discourse online was troubling, and Mr. Kirk's killer was still at large. So, while MTSU considered its response to these events, including how to ensure a safe campus for students and speakers, Ms. Sosh-Lightsy tossed extra hot takes on the emotional conflagration

fueling a violent atmosphere that she herself acknowledged. *See id.* ¶¶ 44-45. In that context, it's hard to imagine a worse time for Ms. Sosh-Lightsy to share posts celebrating the silencing of disfavored viewpoints and recognizing violence as a potential—even if not preferable—means for doing so.

And she used "[a] social media platform [to] amplif[y] the distribution" of her incendiary message. *Grutzmacher v. Howard Cnty.*, 851 F.3d 332, 345 (4th Cir. 2017) (quoting *Livermore v. City of Petersburg*, 844 F.3d 400, 407 (4th Cir. 2016)). "Writing on Facebook is accurately compared to 'writing a letter to a local newspaper' and 'suggests an intent to communicate to the public or to advance a political or social point of view beyond the employment context.'" *Hussey v. City of Cambridge*, 720 F. Supp. 3d 41, 54 (D. Mass. 2024) (quoting *Liverman*, 844 F.3d at 410). Courts have recognized that "such increased exposure amplifies the potential consequences to employers." *Id.* at 55.

Moreover, even though Ms. Sosh-Lightsy's Facebook page allegedly is "not public" and "only [her] Facebook friends can see her posts," that is still more than 700 people, including members of the MTSU community. Compl. ¶¶ 41, 46, 48. So, "[h]er decision to post inflammatory comments to [that] audience … carried a clear risk of amplification." *See Hedgepeth v. Britton*, 152 F.4th 789, 798 (7th Cir. 2025); *see also Shirinian v. Plowman*, No. 3:25-cv-528-KAC-JEM, 2025 WL 3680503, at *4 (E.D. Tenn. Dec. 18, 2025) (citing *Marquardt v. Carlton*, No. 21-3832, 2023 WL 395027, at *5 (6th Cir. 2023)); *Hussey*, 720 F. Supp. 3d at 54-55. And that risk played out here, with millions viewing Ms. Sosh-Lightsy's callous comments. *See* Compl. ¶¶ 48-52. Thus, the manner, time, place, and context of Ms. Sosh-Lightsy's posts all cut against any general interest she might otherwise have in commenting publicly about Mr. Kirk's murder.

### B. MTSU has a substantial interest in avoiding disruption on campus.

Drs. McPhee and Kelley, meanwhile, reasonably determined that Ms. Sosh-Lightsy's posts would disrupt university operations. Speech can cause workplace disruption by, among other things, "impair[ing] discipline by superiors or harmony among co-workers," negatively affecting "close

10

working relationships for which personal loyalty and confidence are necessary," impeding the performance of the employee's duties, disrupting the university's regular operations, or undermining its "mission." *Bennett*, 977 F.3d at 539-40, 544-45 (citation modified). Under this rubric, there is a raft of reasons that Ms. Sosh-Lightsy's posts would interfere with MTSU's operations.

*First*, Ms. Sosh-Lightsy's posts impeded her ability to perform her duties as Associate Dean of Student Care and Conduct, in large part because they negatively affect "close working relationships for which personal loyalty and confidence are necessary." *See id.* at 540 (quoting *Rankin*, 483 U.S. at 388). In her role, Ms. Sosh-Lightsy worked closely with students of all stripes on sensitive issues like conduct, personal and academic challenges, and discipline. *See* Compl. ¶¶ 24, 28-30, 80; ECF No. 1-1; *see also* MTSU, *Office of Student Care and Conduct: Our Mission*, https://perma.cc/8PSE-ZNFR. This made it essential that she be seen "as an objective professional without agendas." Compl. ¶ 66.

But her intolerant Facebook posts exploded that perception. She celebrated the silencing of conservative viewpoints that she claimed were "hate[ful]" and "violent," *id.* ¶¶ 43-44, "treat[ing] a segment of the population … with contempt, so that the particular minority" (here, conservative students) could reasonably come to regard her "as oppressor rather than protector," *Bennett*, 977 F.3d at 543 (quoting *Locurto v. Giuliani*, 447 F.3d 159, 178 (2d Cir. 2006)). In that case, Drs. McPhee and Kelley reasonably concluded, *see* Compl. ¶¶ 58-60; ECF No. 1-1, that she "did not have the competencies necessary to be … effective" in her role, *Shirinian*, 2025 WL 3680503, at *4. This kind of speech revealing extreme bias "erode[s]" respect for state employees in positions of trust, making members of the disfavored "minority . . . less likely to report [incidents], to offer testimony as witnesses, and to rely on the [individual] for protection." *See Bennett*, 977 F.3d at 543 (quoting *Locurto*, 447 F.3d at 178). When a state employee's role depends on the "respect and trust of the community and on the perception" that the employee acts "fairly, even-handedly, and without bias," speech that destroys that perception impedes the employee's ability to perform her duties effectively. *Id.*

11

*Second*, Drs. McPhee and Kelley reasonably concluded that Ms. Sosh-Lightsy's posts would create disharmony among MTSU employees. *See* Compl. ¶¶ 58-60; ECF No. 1-1. MTSU employs thousands of individuals with diverse backgrounds, beliefs, and interests. That includes at least some employees who either hold Mr. Kirk's same views that Ms. Sosh-Lightsy opposed, are sympathetic to those views, or at minimum, believe that those views are not contemptable enough to celebrate their being violently silenced. And the mission of the MTSU Office of Student Care and Conduct is to "promote a learning environment that is safe, positive, and in which the rights of *all members* of the campus community are respected," focusing on "student learning, development, and success." MTSU, *Office of Student Care and Conduct: Our Mission*, https://perma.cc/8PSE-ZNFR (emphasis added); *see also* Compl. ¶¶ 28-30, 58-60; ECF No. 1-1. Achieving this mission necessarily requires employing individuals with diverse viewpoints.

Given that Ms. Sosh-Lightsy's group of curated Facebook friends included members of the MTSU community, *see* Compl. ¶ 46, and her statements eventually became viral and were viewed millions of times, *see* Compl. ¶ 48, Drs. McPhee and Kelley reasonably anticipated that her posts would spur "'nonstop conversation' in the office" among employees that would be disruptive. *See Bennett*, 977 F.3d at 540. Or, worse, that employees who hold views like Mr. Kirk's would struggle to "work side by side and to … work as a team" with Ms. Sosh-Lightsy. *See id.* (quotation omitted). Thus, Drs. McPhee and Kelley reasonably predicted Ms. Sosh-Lightsy's comments would negatively impact "close working relationships" with coworkers "for which personal loyalty and confidence are necessary," *id.* at 540 (quoting *Rankin*, 483 U.S. at 388), the same way it would harm her working relationships with students, *supra* at 11.

These concerns are not "speculative" given the "context" in which Ms. Sosh-Lightsy's "speech arose." *See Gillis v. Miller*, 845 F.3d 677, 685 n.2 (6th Cir. 2017). Just hours after a gruesome killing on another university campus Ms. Sosh-Lightsy made clear that she had "ZERO sympathy"

12

for someone murdered because of the views they advocated. Compl. ¶ 43. She doubled down on that front. *Id.* ¶¶ 43-44. And according to Ms. Sosh-Lightsy, the end of Mr. Kirk's advocacy was worth "celebrating" even if it was achieved by violent means. *Id.* ¶ 44.

Given her office's role in adjudicating sensitive student matters, this demonstrated callousness at least would predictably raise concerns about whether Ms. Sosh-Lightsy could effectively fulfill her duties. Worse still, MTSU employees with views like Mr. Kirk's would be left wondering how her articulated bias would play out in the workplace. Ms. Sosh-Lightsy stated that "violence is not the answer" for her, *id.*, but that leaves plenty of other methods for silencing coworkers whose views she opposed. *See Gustilo v. Hennepin Healthcare Sys., Inc.*, No. 0:22-cv-00352-SRN-DJF, 2025 WL 2539116, at *15, *25 (D. Minn. Sept. 4, 2025) (recognizing disruption where co-workers "no longer felt they could trust" the speaker, that "she was showing good judgment, or that it was safe to talk to her").

And while Ms. Sosh-Lightsy does not allege facts suggesting that her speech directly "impaired discipline by superiors," Drs. McPhee and Kelley reasonably anticipated that "any *inaction* … in the face of [her] derogatory speech could have been seen as an endorsement of the speech and impaired *future* discipline of similar derogatory statements." *Bennett*, 977 F.3d at 540.

*Third*, given the impediments to Ms. Sosh-Lightsy continuing in her role and the discord it would create on campus, Drs. McPhee and Kelley reasonably concluded that her posts would disrupt MTSU's regular operations. "Interference with work, personnel relationships, or the speaker's job performance can detract from the public employer's function." *Rankin*, 483 U.S. at 388. Here, with Ms. Sosh-Lightsy impeded in her role, *supra* at 11, others would need to step up, but Drs. McPhee and Kelley reasonably assessed that other employees would have their own simultaneous distractions and challenges because of her posts, *supra* at 12-13, or even potentially from the more general fallout after an on-campus shooting. This would all constrain the ability of the Office of Student Conduct and Care to function effectively to achieve its core mission. "[A]voiding such interference can be a

13

strong state interest." *Rankin*, 483 U.S. at 388.

*Finally*, Drs. McPhee and Kelley reasonably concluded that Ms. Sosh-Lightsy's posts undermined MTSU's mission to "offer[] exceptional academic programs … that prepare students to thrive in their chosen profession and prioritize[s] student success." MTSU, *About MTSU: Mission Statement*, https://perma.cc/PA64-RYRW; *see* Compl. ¶¶ 28-30, 58-60; ECF No. 1-1. As they explained when they terminated Ms. Sosh-Lightsy, her posts caused the University "irreparable harm." Compl. ¶ 58. Her posts were "inconsistent with [the University's] values" and "undermined" MTSU's "credibility and reputation with [its] students, faculty, staff and the community at large." *Id.* ¶ 60.

MTSU pursues its mission by "foster[ing] a student-centered environment conducive to life-long learning" and "personal development," MTSU, *About MTSU: Mission Statement*, https://perma.cc/PA64-RYRW; *see also* Compl. ¶¶ 25, 28, 60, but Ms. Sosh-Lightsy's comments disrupted that environment, particularly for students whose views she disagreed with, *supra* at 11. MTSU also achieves is mission through positive relationships with "alumni, partners, and friends," MTSU, *About MTSU: Mission Statement*, https://perma.cc/PA64-RYRW, and Ms. Sosh-Lightsy's viral comments caused alumni and community members to express concern. *See* Compl. ¶¶ 48-52. Ms. Sosh-Lightsy's posts did not comport with MTSU's expectations for its employees, they "negatively impacted the academic environment and increased the risk of violence" on campus, brought "the University into disrepute," and adversely affected the University. *See Shirinian*, 2025 WL 3680503, at *4 (cleaned up). This all undermines MTSU's mission, disrupting its interest in effective operations. *Id.*

Even so, Ms. Sosh-Lightsy alleges that there was no "*actual* disruption" at MTSU because of her Facebook posts. *See* Compl. ¶¶ 2, 70-72 (emphasis added). Assuming, for now, that's true, *see Twombly*, 550 U.S. at 555, it doesn't matter. The Sixth Circuit does not require public employers "to allow events to unfold to the extent that the disruption … is manifest before taking action." *Gillis*, 845 F.3d at 687 (quoting *Anzaldua v. Ne. Ambulance & Fire Prot. Dist.*, 793 F.3d 822, 833-34 (8th Cir.

2015)).  So Drs. McPhee and Kelley "need not show actual disruption" to "prevail under the *Pickering*

balancing test."  *Id.*  It is enough that they "could reasonably predict that the employee speech would

cause disruption in light of 'the manner, time, and place' the speech was uttered, as well as 'the context

in which the dispute arose.'"  *Id.* (citation omitted) (quoting *Rankin*, 483 U.S. at 389).  As explained,

Drs. McPhee and Kelley reasonably made that determination here.

### C.  MTSU's interest outweighs Ms. Sosh-Lightsy's, so her conduct is not protected by the First Amendment.

Given the predictable adverse consequences of Ms. Sosh-Lightsy's posts on her job perfor-

mance, work relationships, and university operations, MTSU's interest in avoiding disruption out-

weighs Ms. Sosh-Lightsy's interest in celebrating Mr. Kirk's murder.  So, the First Amendment does

not protect her posts.  For First Amendment protection, Ms. Sosh-Lightsy's interest in speaking must

*outweigh* MTSU's competing interest in effective operations.  *DeCrane*, 12 F.4th at 594.  But for nu-

merous reasons just explained, MTSU had a significant interest in avoiding disruption on campus and

to its operations, while Ms. Sosh-Lightsy had little interest in her public celebration of Mr. Kirk's

assassination.  A lot (MTSU's interest) outweighs a little (Ms. Sosh-Lightsy's interest).  So, the First

Amendment does not apply here.  *See id.*

Even if "both sides ha[d] substantial interests on their side," the "public employer must win."

*See Bennett*, 977 F.3d at 555 (Murphy, J., concurring in the judgment).  That's because courts afford

"greater deference to government predictions of harm used to justify restriction of employee speech

than to predictions of harm used to justify restrictions on the speech of the public at large."  *Id.*

(quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994) (plurality opinion)).  Indeed, public employers

receive "a wide degree of deference" when, as here, "close working relationships are essential to ful-

filling public responsibilities."  *Connick v. Myers*, 461 U.S. 138, 151-52 (1983).  History backs this pub-

lic-employer-friendly "default rule of deference," as "until the 1950s, the government was not thought

to have abridged the freedom of speech by curbing the tongues of its own employees."  *Bennett*, 977

15

F.3d at 555 (Murphy, J., concurring in the judgment) (citation modified). Ms. Sosh-Lightsy cannot overcome the "substantial deference" afforded to MTSU's interests. *See Bd. of Cnty. Commissioners, Wabaunsee Cnty., Kansas v. Umbehr*, 518 U.S. 668, 678 (1996).

In sum, Ms. Sosh-Lightsy cannot show that her interest in speaking outweighs MTSU's interest as a public employer. So, she has not alleged a First Amendment violation. *See Bennett*, 977 F.3d at 545. This means that she fails to state a claim for First Amendment retaliation, *see DeCrane*, 12 F.4th at 594, and Drs. McPhee and Kelley are entitled to qualified immunity, *see Crawford*, 15 F.4th at 762 (plaintiff must establish a constitutional violation to overcome qualified immunity).

## II. Even if Ms. Sosh-Lightsy's Conduct Were Protected, That Was Not Clearly Established When MTSU Terminated Her Employment.

As just explained, the *Pickering* balance tilts against Ms. Sosh-Lightsy and in favor of MTSU, but ultimately Drs. McPhee and Kelley are entitled to qualified immunity even if the Court disagrees about the balance of those competing interests here. That's because state officials are only liable for violating "clearly established" rights. *See Guercio*, 911 F.2d at 1184. And Ms. Sosh-Lightsy cannot carry *her* burden, *Pleasant View Baptist Church v. Beshear*, 78 F.4th 286, 295 (6th Cir. 2023), to show that when Drs. McPhee and Kelley terminated her employment it was clearly established that she had engaged in conduct protected by the First Amendment.

"To be clearly established, 'the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Id.* at 295 (cleaned up). It's not enough for a right to be clearly established "at a high level of generality." *Vanderhoef v. Dixon*, 938 F.3d 271, 278 (6th Cir. 2019). Courts "examine the asserted right 'in light of the specific context of the case, not as a broad general supposition.'" *Barber v. Miller*, 809 F.3d 840, 845 (6th Cir. 2015) (quoting *Lyons v. City of Xenia*, 417 F.3d 565, 571 (6th Cir. 2005)); *White v. Pauly*, 580 U.S. 73, 79 (2017) (requiring that "clearly established law must be 'particularized' to the facts of the case"). The unlawfulness of the official's action "must be apparent" "in the light of pre-existing law." *Rhodes v. Michigan*,

16

10 F.4th 665, 679 (6th Cir. 2021) (internal quotation marks omitted). But the First Amendment right Ms. Sosh-Lightsy claims here was not apparent from case law that existed when she was fired.

**1.** In the First Amendment retaliation context, it has been "clearly established for purposes of qualified immunity" that public employees have the "right to *engage in protected speech* without retaliation." *DeVooght v. City of Warren, Michigan*, 157 F.4th 893, 903 (6th Cir. 2025) (emphasis added). But that right is clearly established only to the extent that case law makes clear that the employee's speech is protected. *Guercio*, 911 F.2d at 1184-85. For that inquiry, it is not sufficient that "the general teachings of *Pickering*[]" were "clear at the time in question." *Id.* at 1184.

Rather, Ms. Sosh-Lightsy must establish that, when Drs. McPhee and Kelley terminated her employment, case law made it impossible for an administrator "of reasonable competence … [to] have disagreed upon whether her right to exercise her first amendment right to free speech … was outweighed by" the University's interest in effective operations. *Id.* at 1185; *McElhaney v. Williams*, 81 F.4th 550, 557 (6th Cir. 2023) (asking "whether any reasonable official would have understood that [the employee's] speech was protected, and thus that the official could not retaliate against him"). In other words, it must have been clearly established "where the *Pickering* scale, with all of the parties' competing interests in the balance, would ultimately come to rest." *Guercio*, 911 F.2d at 1189. Here, it's clear that the balance favors MTSU, but at the very least, it was not clear that the balance would favor Ms. Sosh-Lightsy. *Supra* § I (demonstrating that the balance of interests favors MTSU). Instead, Drs. McPhee and Kelley "reasonably could have thought that their actions were consistent with the rights" that Ms. Sosh-Lightsy "claims have been violated." *Garvie v. Jackson*, 845 F.2d 647, 649 (6th Cir. 1988).

Consider *Bennett v. Metro. Gov't of Nashville & Davidson Cnty.* There, the plaintiff Bennett worked in a position of trust before making an offensive Facebook post that evidenced bias against a particular community, thereby impeding her ability to fulfill her job duties, causing workplace tension, and

17

undermining her employer's mission. *See Bennett*, 977 F.3d at 538-45. The same is true here. Addressing these facts, the Sixth Circuit reversed the lower court's determination that *Pickering* balancing favored Bennett and held that the public employer's interest in effective operations won out in these circumstances. *Bennett*, 977 F.3d at 538-45. Thus, as Drs. McPhee and Kelley considered how to respond to Ms. Sosh-Lightsy's posts, precedent clearly established that the First Amendment *did not* shield her conduct, not the other way around.

**2.** Importantly, Drs. McPhee and Kelley do not have the burden of coming up with cases establishing the reasonableness of their *Pickering* decision. *See Pleasant View Baptist Church*, 78 F.4th at 295. Rather, it's up to Ms. Sosh-Lightsy to direct the Court to contrary case law making it *clear* that Drs. McPhee and Kelley got the *Pickering* balance wrong. *See Guercio*, 911 F.2d at 1185. That's a tall task that Ms. Sosh-Lightsy can't achieve.

Even though case law typically does not have to address the "very action in question" to clearly establish a right, *Rhodes*, 10 F.4th at 679, the nature of the *Pickering* inquiry requires close similarity. *See, e.g.*, *DiMeglio v. Haines*, 45 F.3d 790, 806 (4th Cir. 1995) ("[O]nly infrequently will it be 'clearly established' that a public employee's speech on a matter of public concern is constitutionally protected, because the relevant inquiry requires a 'particularized balancing' that is subtle, difficult to apply, and not yet well-defined."). Deciding whether Ms. Sosh-Lightsy has a greater interest in celebrating Mr. Kirk's assassination or whether MTSU has a greater interest in effective campus operations can be like "judging whether a particular line is longer than a particular rock is heavy." *See Bendix Autolite Corp. v. Midwesco Enters., Inc.*, 486 U.S. 888, 897 (1988) (Scalia, J., concurring in the judgment). Sixth Circuit judges struggle with "[h]ow to make that call." *See Noble*, 112 F.4th at 385 (Sutton, C.J., dissenting); *Bennett*, 977 F.3d at 547-56 (Murphy, J., concurring). So, for case law to have made it clear to non-lawyer officials like Drs. McPhee and Kelley that Ms. Sosh-Lightsy's "right to exercise her first amendment right to free speech" outweighed the University's interest in effective operations, *Guercio*,

18

911 F.2d at 1185, she'll need a highly similar case going her way.

But no such case exists. That's particularly so considering the abundance of case law making clear that public employers can take action against an employee to avoid predictable disruption because the employee's widely disseminated comments impede her job performance, work relationships, and the employer's mission. *See Shirinian*, 2025 WL 3680503, at *4 (citing *Rankin*, 483 U.S. at 388; *Bennett*, 977 F.3d at 539, 541; *Gillis*, 845 F.3d at 687; and *Marquardt*, 2023 WL 395027, at *5). Since the case law that existed at the time MTSU terminated Ms. Sosh-Lightsy made it at least possible to "disagree" about the *Pickering* balance here, Drs. McPhee and Kelley are entitled to qualified immunity. *Guercio*, 911 F.2d at 1185.

**3.** Qualified immunity requires immediate dismissal of the individual-capacity defendants. Qualified immunity shields state officials "not merely from liability, but also from litigation and discovery." *Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022). It follows that, as a defense against "suit rather than [just] liability," qualified immunity "must 'be resolved *prior to discovery*'" rather than afterwards, whenever possible. *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231-32 (2009), and adding emphasis). If it is "properly raised prior to discovery, the district court has" not just the option but the "duty to address it." *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 522 (6th Cir. 2002)).

## CONCLUSION

For all these reasons, the Court should dismiss the Complaint because it fails to state a claim for First Amendment retaliation. At minimum, qualified immunity bars Ms. Sosh-Lightsy's individual-capacity claims against Drs. McPhee and Kelley, requiring that they be dismissed.

Date: January 20, 2026                    Respectfully submitted,


                                          */s/ Harrison Gray Kilgore*
                                          HARRISON GRAY KILGORE, BPR# 041842
                                          Senior Assistant Attorney General
                                            for Strategic Litigation
                                          ZACHARY L. BARKER, BPR# 035933
                                          Senior Assistant Attorney General
                                            Constitutional Defense Division
                                          Office of the Tennessee Attorney General
                                          P.O. Box 20207
                                          Nashville, Tennessee 37202
                                          (615) 741-8726
                                          Harrison.Kilgore@ag.tn.gov
                                          Zachary.Barker@ag.tn.gov

                                          *Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served via the Court's electronic filing system on this 20th day of January, 2026 to all counsel of record.

Charles P. Yezbak III
Melody Fowler-Green
N. Chase Teeples
Yezbak Law Offices PLLC
P.O. Box 159033
Nashville, TN 37215-9937
Phone: 615-250-2000
Fax: 615-250-2020
yezbak@yezbaklaw.com
mel@yezbaklaw.com
teeples@yezbaklaw.com

*Counsel for Plaintiff*

Tess Medlin Heisserer
EmployLegal
611 Commerce St
Suite 2611
Nashville, TN 37203
(615) 854-9603
theisserer@forceforwork.com

*Counsel for Plaintiff*

*/s/ Harrison Gray Kilgore*
HARRISON GRAY KILGORE
Office of the Tennessee Attorney General
P.O. Box 20207
Nashville, Tennessee 37202
Harrison.Kilgore@ag.tn.gov

*Counsel for Defendants*