IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| LAURA SOSH-LIGHTSY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:25-cv-01287 |
| v. | ) | |
| | ) | JUDGE RICHARDSON |
| DR. SIDNEY MCPHEE, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**<u>MEMORANDUM OPINION</u>**

Plaintiff, Laura Sosh-Lightsy, initiated this lawsuit on November 5, 2025, by filing a complaint (Doc. No. 1), therein naming as Defendants Dr. Sidney McPhee ("McPhee") and Dr. Danny Kelley ("Kelley"). Plaintiff filed an amended complaint (Doc. No. 24, "Amended Complaint") on February 10, 2026, which likewise named (only) McPhee and Kelley as Defendants,[1] and which is now the operative complaint in this action.

Now pending before the Court is the motion to dismiss (No. 27, "Motion") filed by Defendants and supported by a memorandum (Doc. No. 28, "Opening Brief").Via the Motion, Defendants seek the dismissal of Plaintiff's Amended Complaint pursuant to Rule 12(b)(6). Plaintiff has filed a response (Doc. No. 31 "Response") in opposition to the Motion, and Defendants have filed a reply (Doc. No. 35, "Reply"),[2] in further support of the Motion.

---

[1] McPhee and Kelley are sued in both their individual capacities and their official capacities.

[2] Defendants filed two replies—the Reply at Docket No. 35, and a reply ("First Reply") at Docket No. 34. In the Reply, Defendants explain that in the First Reply "Defendants mistakenly exceeded the limit of five pages [prescribed in the Local Rules for reply briefs] and therefore submit, with Plaintiff's permission, an Amended Reply[ (i.e., the Reply)]." Given these circumstances, the Court will treat the Reply—rather than the First Reply—as the operative reply herein.

For the reasons described herein, the Court will **DENY** the Motion in its entirety.

<u>ALLEGED FACTS</u>[3]

*1. The Parties*[4]

Plaintiff is an individual who resides in Rutherford County, Tennessee. (Doc. No. 24 at ¶ 14). In 2004, Plaintiff began working for Middle Tennessee State University ("MTSU") as the Assistant Dean for Judicial Affairs and Mediation Services. (*Id.* at ¶ 23). "MTSU promoted Plaintiff to the role of Associate Dean of Student Care and Conduct in January 2025," (*id.* at ¶ 24), and "[a]dditionally, from 2011 until her termination in 2025, [Plaintiff] served as Deputy Coordinator for Title IX compliance at MTSU." (*Id.* at ¶ 25). Plaintiff also taught a class at MTSU "from approximately 2005 or 2006 until approximately 2015 or 2016 . . . to assist incoming MTSU students adjust [sic] to college life." (*Id.* at ¶ 28). In her last performance review during her employment with MTSU, "Plaintiff received a rating of Exceeds Expectations." (*Id.* at ¶ 30).

McPhee is an individual residing in Rutherford County, Tennessee. (*Id.* at ¶ 15). "At all relevant times [implicated by the Amended Complaint,]" McPhee was the President of MTSU.

---

[3] The facts herein are taken from the Amended Complaint. For purposes of the instant Motion, the facts in the Amended Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.
 The Court quotes extensively from the Amended Complaint herein. For clarity, the Court notes that unless indicated otherwise, as for example, by the use of single quotation marks nested within a portion of the Amended Complaint quoted using double quotation marks, it is quoting the Amended Complaint and not directly quoting some statement (made during the underlying alleged events at issue) that the Amended Complaint quoted or paraphrased.

[4] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Amended Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

(*Id.* at ¶ 16). Kelley is an individual who resides in Davidson County, Tennessee. (*Id.* at ¶ 17). "At all relevant times [implicated by the Amended Complaint,]" Kelley was the Interim Vice President for Student Affairs and Dean of Students of MTSU. (*Id.* at ¶ 18).

2. *Factual Background*

On September 10, 2025, Charlie Kirk ("Kirk") "was shot and killed on the campus of Utah Valley University." (Doc. No. 24 at ¶ 37). On the evening of September 10, 2025, "Plaintiff made a series of posts about [] Kirk and his political messages, especially his prior statements concerning gun violence, on her personal Facebook page." (*Id.* at ¶ 45). Plaintiff's "personal Facebook page is not public; only Plaintiff's Facebook friends can see her posts." (*Id.* at ¶ 46). Kelley is one of Plaintiff's Facebook friends. (*Id.* at ¶ 48). Despite Plaintiff's "long history of posting political content on her private Facebook page," (*id.* at ¶ 47), "Kelley never raised any issue with [Plaintiff's] Facebook posts or that her personal political views might interfere with her performance of her job duties for MTSU." (*Id.* at ¶ 49). Further, Plaintiff's "Facebook page contains a disclaimer; [the disclaimer] states that '[t]he ideas/commentary shared here on [Plaintiff's] personal page may not reflect the ideologies of [her] employers.'" (*Id.* at ¶ 50).

Plaintiff made her first Facebook post concerning "Kirk's murder and his prior statements concerning gun violence on September 10 at 7:03 p.m." (*Id.* at ¶ 51).[5] That post, a screenshot of which is reproduced in the Amended Complaint (a screenshot which the Court reproduces herein), is as follows:

---

[5] At times the Court refers herein to dates without specifying the particular year of a particular date—e.g., "September 10." For clarity that Court notes that when the year is not specified in a particular date, that particular date is a date in 2025.



(*Id.* at 8, "First Post").

Plaintiff made a second post concerning "Kirk's murder and his prior statements concerning gun violence on September 10 at 7:17 p.m." (*Id.* at ¶ 52). That post, a screenshot of which is reproduced in the Amended Complaint (a screenshot which the Court reproduces herein), is as follows:



(*Id.* at 9, "Second Post"). Plaintiff made a third Facebook post regarding "Kirk's murder and his prior statements concerning gun violence on September 10 at 8:55 p.m." (*Id.* at ¶ 53). That post, a screenshot of which is reproduced in the Amended Complaint (a screenshot which the Court reproduces herein), is as follows:



(*Id.* at 10, "Third Post," and collectively with the First Post and the Second Post, "At-Issue Posts").

On the evening of September 10, a former MTSU student, Matthew Hurtt ("Hurtt")—who is one of Plaintiff's Facebook friends and who now works for the Republican Party—"began posting screenshots of [the At-Issue Posts] on his [] X social media account." (*Id.* at ¶ 54). And,

between "7:43 p.m. and 9:05 p.m. on September 10, Hurtt posted screenshots of all three of [the At-Issue Posts] to his X account." (*Id.* at ¶ 55). Subsequently, at 9:33 p.m. on September 10, United States Senator Marsha Blackburn ("Senator Blackburn") reposted one of Hurtt's X posts, and stated, referring to Plaintiff: "This person should be ashamed of her post. She should be removed from her position at @MTSU." (*Id.* at 15, ¶ 60).

Additionally, at some point after Plaintiff made the At-Issue Posts, "Tennessee Comptroller of the Treasury Jason Mumpower ("Mumpower") called MTSU Government Relations Liaison Bill Ketron ("Ketron") about Plaintiff." (*Id.* at ¶ 63). "Mumpower told Ketron during the phone call that MTSU, including Defendants, needed to 'do something about [Plaintiff] or [else Mumpower] would,' or similar words to that effect." (*Id.* at ¶ 64).

At 10:42 p.m. on September 10, McPhee's "executive assistant called [Plaintiff] []to connect Plaintiff with [] McPhee and Kelley." (*Id.* at ¶ 69). During the call that ensued once the connection was made ("Termination Phone Call"), "McPhee stated to [Plaintiff] that [Plaintiff's] comments [in the At-Issue Posts] concerning [] Kirk's murder and his prior statements concerning gun violence [] caused irreparable harm to MTSU and that Plaintiff [] could no longer be trusted to work with MTSU's students." (*Id.* at ¶ 70). Further, during the Termination Phone Call, McPhee terminated Plaintiff's employment with MTSU. (*Id.* at ¶ 71).

At 10:51 p.m., McPhee issued a public statement regarding Plaintiff's termination, which provided:

> An MTSU employee today offered inappropriate and callous comments on social media concerning the horrific and tragic murder of Charlie Kirk. The comments by this employee, who worked in a position of trust directly with students, were inconsistent with our values and have undermined the university's credibility and reputation with our students, faculty, staff and the community at large. This employee has been fired effective immediately. We extend our deepest sympathies to the Kirk family.

(*Id.* at ¶ 72).

"Less than four hours elapsed in the evening between Plaintiff's [First Post] [] and []. McPhee and Kelley informing [Plaintiff] that she was fired, effective immediately," (*id.* at ¶ 81), and "[j]ust over one hour elapsed between Senator Blackburn's X post, advocating for Plaintiff's termination, and [] McPhee and Kelley informing Plaintiff that she was fired." (*Id.* at ¶ 85).

The next day—September 11—Defendants "sent Plaintiff the paperwork [memorializing her termination] via U.S. mail." (*Id.* at ¶ 73).[6] This paperwork was signed by Kelley and was received by Plaintiff on September 15, 2025. (*Id.* at ¶¶ 73-74). The paperwork sent to Plaintiff included a letter ("Kelley Letter") signed by Kelley. (*Id.* at ¶¶ 73-75).[7] The Kelley Letter provided in relevant part:

> On September 10, 2025, you posted insensitive comments regarding the murder of Charlie Kirk on Face book. In your leadership role in the Office of Student Care and Conduct, you oversee the adjudication of student behavioral matters. This responsibility requires students and other University community members to see you as an objective professional without agendas. As a result of your comments on social media, that perception has been damaged to such an extent that we have determined that you can no longer effectively assess and resolve any student conduct matters, particularly those involving students whose opinions align with Mr. Kirk's.
>
> Because of these comments and their disruption and interference with University operations, MTSU has terminated your employment for cause effective immediately, with September 10, 2025 as your last day of employment.

---

[6] Although the Amended Complaint suggests that the paperwork sent to Plaintiff on September 11 *terminated* Plaintiff's employment at MTSU, (Doc. No. 24 at ¶ 73), the Court discerns that the better understanding of the September 11 paperwork was that such paperwork *memorialized* Plaintiff's termination, given that the Amended Complaint states clearly that Plaintiff's termination occurred during the Termination Phone Call. (*Id.* at ¶ 71).

[7] The Amended Complaint is unclear as to whether the Kelley Letter was merely a *part* of the paperwork sent to Plaintiff or whether the Kelley Letter comprised the *entirety* of the paperwork sent to Plaintiff. The Court discerns that it is likely that the Kelley Letter was a part, rather than the entirety, of the paperwork sent to Plaintiff on September 11.

(Doc. No. 25-1).[8] [9]

Additionally, on September 11—i.e., the date that Defendants sent Plaintiff paperwork memorializing her termination—Defendants "ran a red-alert banner across the top of [MTSU's] homepage announcing Plaintiff's termination of employment." (*Id.* at ¶ 87). "The red-alert banner is typically used for campus emergencies at MTSU, for example campus lockdowns and severe weather alerts." (*Id.* at ¶ 88). Further, "Defendants did not consider less-severe sanctions than terminating [Plaintiff's] employment in response [to the At-Issue Posts]." (*Id.* at ¶ 97).

### 3. *Plaintiff's Claim and Defendants' Motion*

#### a. Plaintiff's Claim

Based on the forgoing Plaintiff brings a single claim (Count I). Via Count I, Plaintiff brings a 42 U.S.C. § 1983 claim for First Amendment retaliation against Defendants in their individual and official capacities. Count I is premised on Plaintiff's assertions (conclusion) that the At-Issue Posts "are speech protected by the First Amendment," (Doc. No. 24 at ¶ 116), and that in the At-Issue Posts, Plaintiff "spoke as a private citizen on a matter of public concern, namely Kirk's

---

[8] A copy of the Kelley Letter was filed at Docket No. 25-1. For reasons detailed in a footnote below, the Court may consider the Kelley Letter in its adjudication of the Motion.

[9] Plaintiff contends that the substance of the Kelley Letter—and in particular the termination of Plaintiff and the (purported) reasons for that termination that were memorialized in the Kelley Letter—violates an MTSU policy, "Policy 103." (Doc. No. 24 at ¶ 77). Portions of Policy 103 are quoted in the Amended Complaint (*id.*), and a copy of Policy 103—which for reasons the Court explains in a footnote below, the Court may consider in its examination of the Motion—was filed at Docket No. 25-2. Plaintiff seems (although this is unclear) to rely on Policy 103 for the notion that because (according to Plaintiff) Policy 103 protects free speech at MTSU, a "reasonable government official would have recognized that Defendants' termination of [Plaintiff's] employment [] violated clearly established law." (Doc. No. 24 at ¶ 127). As it happens, Policy 103 is mentioned only in passing in the briefing on the Motion, (Doc. No. 31 at 8), and furthermore, whatever an internal MTSU policy—like Policy 103—says or does not say has no bearing on what the *law* is. Accordingly, the Court does not discern that Policy 103 is germane to the Court's analysis of the Motion. So, the Court declines to further address herein any aspect of Policy 103— whether the selected quotations from Policy 103 in the Amended Complaint or anything else in the full copy of Policy 103 filed at Docket No. 25-2.

murder and his prior public statements concerning gun violence." (*Id.* at ¶ 117). Plaintiff further alleges that (1) her interest "in speaking on a matter of public concern, namely Kirk's murder and his prior public statements concerning gun violence, outweigh any contrary interest of Defendants in MTSU's operations" (*id.* at ¶ 118); (2) Plaintiff's "exercise of her right to free speech did not disrupt her performance of her job duties or any other MTSU operations" (*id.* at ¶ 119); and (3) Plaintiff's "exercise of her right to free speech would not have caused any future disruption to her performance of her job duties or any other MTSU operation." (*Id.* at ¶ 120). Additionally, Plaintiff alleges that (1) "Defendants took adverse actions against [Plaintiff] that would deter a person of ordinary firmness from continuing in speech protected by the First Amendment" (*id.* at ¶ 121);[10] (2) "Defendants' termination of [Plaintiff's] employment was motivated at least in part by Plaintiff's protected speech" (*id.* at ¶ 122); (3) "Defendants' termination of Plaintiff's employment followed an official MTSU policy or policies that resulted in the violation of [Plaintiff's constitutional rights]" (*id.* at ¶ 124)[11]; (4) "Defendants singled out [Plaintiff's] speech for an adverse action based on [Plaintiff's] viewpoint"(*id.* at ¶ 125); and (5) "Defendants allowed third parties, including but not limited to Hurtt and/or Senator Backburn, to engage in a 'heckler's veto'

---

[10] Plaintiff specifically identifies two (alleged) adverse actions: (1) the termination of her employment; and (2) Defendants "making critical public statements about her that damaged her personal and professional reputation." (Doc. No. 24 at ¶ 121). Presumably, these "critical public statements" include the public statement made by McKee at 10:51 pm on September 10, where McKee announced Plaintiff's termination (*id.* at ¶ 72), and perhaps also the content of the "red-banner alert" on the MTSU website that announced Plaintiff's termination. (*Id.* at ¶ 87).

[11] In this allegation, Plaintiff specifically refers for the first (and last) time to an MTSU policy, "Policy 851," as an example of an MTSU policy that Defendants followed when terminating Plaintiff's employment, thereby (allegedly) violating Plaintiff's constitutional rights. (Doc. No. 24 at ¶ 124). Notably the complaint here is the *opposite* of Plaintiff's complaint with respect to Policy 103—i.e., with respect to Policy 103 Plaintiff complains that Defendants acted *contrary* to an MTSU policy in terminating her, whereas with respect to Policy 851, Plaintiff complains that Defendants *followed* an MTSU policy in terminating her. A copy of Policy 851, which, for reasons the Court explains in a footnote below the Court may consider in its evaluation of the Motion, was filed at Docket No. 25-3. The Court does not discern, and Plaintiff does not explain, how Policy 851 in particular is relevant to the (sole) claim brought in this action— namely a claim for First Amendment retaliation. So, the Court will not further address Policy 851.

against [Plaintiff]," and "bow[ed] to public pressure to terminate Plaintiff's employment for protected speech on a matter of public concern [] based on the speech's viewpoint." (*Id.* at ¶ 126). Finally, Plaintiff alleges that "Defendants' termination of [Plaintiff's] employment was under color of law" (*id.* at ¶ 123), and that "[a]ny reasonable government official would have recognized that Defendants' termination of [Plaintiff's] employment in retaliation for her protected speech violated clearly established law, especially considering MTSU's publicly stated goals and its free speech policies." (*Id.* at ¶ 127).

b. Defendants' Motion

Defendants bring their Motion on two grounds, which are fulsomely explained in the Opening Brief. Via the Opening Brief, Defendants first contend that Plaintiff's speech in the At-Issue Posts is not constitutionally protected as required for a claim of First Amendment retaliation so that (according to Defendants) the sole claim in this action (Count I) should be dismissed in its entirety. (Doc. No. 28 at 14-24). Defendants next contend that even if Plaintiff's speech in the At-Issue Posts *is* constitutionally protected, then Defendants are still entitled to qualified immunity so that the sole claim in this action (Count I) should be dismissed to extent that this claim is brought against Defendants in their *individual* capacities.[12] (Doc. No. 28 at 24-27). In her Response, Plaintiff takes issue with each of these contentions.

---

[12] In other words, assuming Defendants were entitled to qualified immunity, qualified immunity would not lead to the dismissal of Count I to the extent Count I is brought against Defendants in their *official capacities*. *See e.g., United Food & Com. Workers Loc. 1099 v. City of Sidney*, 364 F.3d 738, 752 n.4 (6th Cir. 2004) ("the defense of qualified immunity [] is not available to officers who have been sued in their official capacities.").

Notably, a court considering a motion to dismiss may "dismiss under Fed. R. Civ. P. 12(b)(6) based on qualified immunity." *Jackson v. Schultz*, 429 F.3d 586, 589 (6th Cir. 2005). *See also Duren v. Byrd,* No. 1:18-CV-00084, 2021 WL 3848105, at *9 (M.D. Tenn. Aug. 26, 2021) ("[I]n noting that the defense of qualified immunity is prone to rejection when asserted as a 12(b)(6) or 12(c) motion, the Sixth Circuit makes clear that the defense indeed can be asserted in that manner.").

<u>LEGAL STANDARD</u>

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all of the factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id*. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id*. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id*. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id*. at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id*.; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bold" allegations. *Id*. at 681. The question is whether the remaining allegations—factual

allegations, i.e., allegations of factual matter—plausibly suggest an entitlement to relief. *Id*. If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id*. at 683.

Notably, the above principles are most applicable to one kind (the most common kind) of argument made on a Rule 12(b)(6) motion, namely the argument that the plaintiff's allegations are *insufficient* to state a claim. Here, Defendants' first of the above-stated arguments is of this type.

But there is a second (and less common) kind of argument that can be made on a Rule 12(b)(6) motion for why a plaintiff's allegations fail to state a claim, namely that they affirmatively show that the defendant(s) necessarily has (have) a legal defense that is fatal to the claim. *See, e.g., Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016) ("Although a motion pursuant to Rule 12(b)(6) [generally] invites an inquiry [only] into the legal sufficiency of the complaint, not an analysis of potential defenses to the claims set forth therein, dismissal nevertheless is appropriate when the defendant is entitled to a meritorious affirmative defense such as qualified immunity."). For a 12(b)(6) motion to be granted based on this kind of argument, the allegations of the complaint (together with anything else that, as identified below, properly can be considered along with those allegations) must affirmatively show that the defendant necessarily is entitled to the asserted defense as a matter of law. *See, e.g. Bushong v. Delaware City School Dist.*, 851 F. App'x 541, 545 (6th Cir. 2021) ("Because the failure to exhaust is an affirmative defense, dismissal under Rule 12(b)(6) . . . is appropriate only if the face of the complaint shows that the plaintiff has not in fact exhausted her administrative remedies."); *Cataldo v. U.S. Steel Corp.*, 676 F.3d 542, 547 (6th Cir. 2012) (stating in connection with a limitations defense, that when "the allegations in the complaint affirmatively show that the claim is time-barred," then "dismissing the claim under

Rule 12(b)(6) is appropriate."). The second of Defendants' above-stated arguments—that is, their argument as to qualified immunity—is of this type.

Of note, Fed. Rule of Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein."[13] *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *See also Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016) ( "when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." (quoting *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36

---

[13] The Court notes that consistent with these principles, the Court herein may consider the Kelley Letter (Doc. No. 25-1) without converting the Motion into a motion for summary judgment, for two alternative reasons. The first is that the Kelley Letter—which was filed the day after the Amended Complaint as part of a supplement to the Amended Complaint that explained that the Kelley Letter was intended to be attached to the Amended Complaint but was inadvertently omitted (Doc. No. 25 at 1)—likely may be considered (and is so considered by the Court herein) as "an[ ] exhibit attached" to the Amended Complaint. *Bassett*, 528 F.3d at 430. Alternatively, the Kelley Letter may be considered because it is referred to in the Amended Complaint and is central to the claims therein (insofar as the Kelley Letter appears to memorialize Plaintiff's termination of employment and additionally memorializes certain purported reasons for that termination).
  The Court can also consider the copy of Policy 103 at Docket No. 25-2 and the copy of Policy 851 at Docket No. 25-3, because (consistent with the Court's treatment of the Kelley Letter) the Court considers the copy of Policy 103 (Doc. No. 25-2) and the copy of Policy 851 (Doc. No. 25-3), each of which were also filed as part of the same supplement containing the Kelley Letter, as exhibits attached to the Amended Complaint. Even though the Court may consider the copy of Policy 103 and the copy of Policy 851 herein without transforming the Motion into a motion for summary judgment, ultimately the Court does not do so, because, consistent with the discussion in two earlier footnotes, the Court does not discern how either Policy 103 or Policy 851 is germane to the sole claim brought in this action.

(6th Cir. 2007)); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018) ("Documents attached to the motion to dismiss briefing may be considered part of the pleadings if they were incorporated into the complaint by reference and are central to the plaintiff's claim."). "It must also be clear that there exists no material disputed issues of fact regarding the relevance of the document." *Mediacom Se. LLC v. BellSouth Telecommunications, Inc.*, 672 F.3d 396, 400 (6th Cir. 2012) (cleaned up and quotation omitted). "In other words, if the authenticity, validity, or enforceability of a document is not in dispute, the court may consider it on a motion to dismiss, but a genuine dispute as to the legal sufficiency of a document requires the court to consider the issue under a motion for summary judgment standard." *Lewis Lumber & Milling, Inc. v. Mereen-Johnson, LLC*, No. 3:17-CV-00643, 2018 WL 6181356, at *2 (M.D. Tenn. Nov. 27, 2018).

<u>DISCUSSION</u>

Adhering to the sequencing of Defendants' arguments in the Opening Brief, the Court will first consider whether the sole claim (Count I) in this action should be dismissed in its entirety because (according to Defendants) Plaintiff's speech in the At-Issue Posts is not constitutionally protected so that Plaintiff has failed to state a claim for First Amendment retaliation. (Doc. No. 28 at 14-24). The Court will second consider whether Defendants are entitled to qualified immunity so that to the extent that the sole claim in this action (Count I) is brought against Defendants in their *individual capacities*, then this claim should be dismissed to that extent. (Doc. No. 28 at 24-27).

*1. Whether Plaintiff's Speech is Protected by the First Amendment[14]*

To state a claim for First Amendment retaliation, a plaintiff must allege that:

(1) he engaged in constitutionally protected speech or conduct; (2) an adverse action was taken against him that would deter a person of ordinary firmness from continuing to engage in that conduct; [and] (3) there is a causal connection between elements one and two—that is, the adverse action was motivated at least in part by his protected conduct.

*Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)).

When a public employee plaintiff—like Plaintiff—brings a First Amendment retaliation claim, that plaintiff must satisfy three sub-elements in order to make out the first element of a claim for First Amendment retaliation—i.e., that he or she was engaged in constitutionally protected speech or conduct. These three sub-elements are:

First, the employee must speak on "matters of public concern." [*Evans-Marshall v. Bd. of Educ.*, 624 F.3d 332, 337 (6th Cir. 2010)] (citing *Connick*, 461 U.S. at 143, 103 S. Ct. 1684). Second, the employee must speak as a private citizen and not as an employee pursuant to his official duties. *Id.* at 338 (citing *Garcetti*, 547 U.S. at 421, 126 S. Ct. 1951). Third, the employee must show that his speech interest outweighs "the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* (quoting *Pickering* [*v.*

---

[14] As the Court discusses below, the first element of a claim for First Amendment retaliation is that a plaintiff have "engaged in constitutionally protected speech or conduct." *Gillis v. Miller*, 845 F.3d 677, 683 (6th Cir. 2017) (quoting *Dye v. Office of the Racing Comm'n*, 702 F.3d 286, 294 (6th Cir. 2012)). The Court is aware that there is a difference between speech and conduct in a First Amendment context. *McLemore v. Gumucio*, 149 F.4th 859, 867 (6th Cir. 2025) (Bush, J. concurring) ("Free-speech doctrine distinguishes between conduct and speech."), *cert. denied*, 146 S. Ct. 892 (2025). Below, the Court quotes from Defendants' briefing on the Motion wherein Defendants argue that Plaintiff's claim should be dismissed because (again according to Defendants) Plaintiff's *conduct* in making the At-Issue Posts is not constitutionally protected. (*See e.g.,* Doc. No. 28 at 15; Doc. No. 35 at 2).

  With that said, it strikes the Court as more precise to frame the inquiry in the instant case in terms not of whether Plaintiff's conduct in making the At-Issue Posts is constitutionally protected, but rather of whether the *speech in* the At-Issue Posts is constitutionally protected. *See e.g., Hopkins v. Melendez,* No. 24-CV-1263 (VDO), 2024 WL 4111058, at *4 (D. Conn. Sept. 5, 2024) ("Plaintiff's posts to social media or on the internet constitute protected speech."); *Schmidt v. Huff*, No. 25-CV-2081-EFM-GEB, 2025 WL 2374153, at *9 (D. Kan. Aug. 14, 2025) ("Plaintiff's [] social media post was constitutionally protected speech."). And so, below the Court will, when not quoting directly from Defendants' briefing, discuss Plaintiff's claim in terms of whether the *speech in* the At-Issue Posts is constitutionally protected.

*Bd. Of Educ of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563, 568 (1968))].

*Mayhew v. Town of Smyrna, Tenn.*, 856 F.3d 456, 462 (6th Cir. 2017).[15] Courts sometimes refer to last of these three sub-elements as *Pickering* balancing, after the case *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cnty., Ill.*, 391 U.S. 563 (1968). *See e.g., DeCrane v. Eckart*, 12 F.4th 586, 594 (6th Cir. 2021) ("And even if the speech survives these two steps, the First Amendment protects the speech only if the employee's interest in speaking outweighs the employer's interest in operating—a test that has come to be called '*Pickering* balancing.'"). The Court herein will do likewise.[16]

With respect to the particular elements (or as it may be, sub-elements of the first element) of a First Amendment retaliation claim, Defendants contend solely[17] that Plaintiff falters on the first element of a claim for First Amendment retaliation (i.e., that Plaintiff engaged in constitutionally protected speech or conduct). In particular, Defendants contend that under the third sub-element—i.e., the *Pickering* balancing test—of the first element of a claim for First Amendment retaliation, Plaintiff "cannot show that her interest in celebrating [] Kirk's silencing

---

[15] Some courts combine the first and second element of the above quoted test into one single element, which they refer to—somewhat confusingly—in terms of "whether the statement in question constitutes speech on a matter of public concern," while noting that examining "whether the statement in question constitutes speech on a matter of public concern" necessarily includes evaluation of whether the "employee spoke as a private citizen or public employee in the course of employment." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tennessee*, 977 F.3d 530, 537, 537 n.1 (6th Cir. 2020).

[16] Of note, *Pickering* balancing in turn should account for several factors. These include "whether an employee's comments meaningfully interfere with the performance of her duties, undermine a legitimate goal or mission of the employer, create disharmony among co-workers, impair discipline by superiors, or destroy the relationship of loyalty and trust required of confidential employees." *Rodgers v. Banks*, 344 F.3d 587, 601 (6th Cir. 2003) (quoting *Williams v. Com. of Ky.*, 24 F.3d 1526, 1536 (6th Cir. 1994)). Relevant factors can also include "the manner, time, and place of the employee's expression." *Id.* (quoting *Rankin v. McPherson*, 483 U.S. 378, 388 (1987)).

[17] Defendants do not argue that Plaintiff has failed to sufficiently allege any other element of a claim for First Amendment retaliation or any of the sub-elements of the first element of such a claim.

outweighed MTSU's interest [(i.e., the State's interest)] in effective campus operations." (Doc. No. 28 at 15). Defendants specifically contend (in the headers of the Opening Brief) that (1) "[Plaintiff] has little First Amendment interest in her conduct [in making the At-Issue Posts]" (*id.* at 15); (2) "MTSU has a substantial interest in avoiding disruption on campus [that could result from the At-Issue Posts]" (*id.* at 17); and (3) "MTSU's interest outweighs [Plaintiff's], so her conduct is not protected by the First Amendment." (*Id.* at 23). However, the Court will not evaluate the substantive merits of the instant argument, because it is not convinced that it in fact *can* evaluate this particular argument—i.e., by engaging in *Pickering* balancing—at this particular stage of the litigation (i.e., on the instant Motion).

The Motion is a motion to dismiss, and numerous courts have noted the difficulty and inadvisability of conducting *Pickering* balancing at the motion-to-dismiss stage. *See e.g., Perry v. McGinnis*, 209 F.3d 597, 607 (6th Cir. 2000) ("In many cases, due to inadequate factual development, the [*Pickering*] balancing test 'cannot be performed on a 12(b)(6) motion.'");[18] *Joyner v. Cincinnati Pub Schs.*, No. 1:06-CV-00803, 2008 WL 1844319, at *4 (S.D. Ohio Apr. 22, 2008) (observing, when evaluating a motion to dismiss, that "[t]he Court is further unconvinced [] that it would be appropriate in this matter to apply the *Pickering* balance test without a more developed record."). *See also Brown v. City of Tulsa*, 124 F.4th 1251, 1269 (10th Cir. 2025) ("conducting *Pickering* balancing is usually inappropriate – if not impossible – at the motion to dismiss stage."); *Gustafson v. Jones*, 117 F.3d 1015, 1019 (7th Cir.1997) ("Normally, application of the *Pickering* balancing test will be possible only after the parties have had an opportunity to conduct some discovery."); *Weisbuch v. Cnty. of Los Angeles*, 119 F.3d 778, 785 (9th Cir. 1997)

---

[18] Strictly speaking, in *Perry* the Sixth Circuit referred to what is now commonly known as *Pickering* balancing as the "prong two balancing test." *Perry*, 209 F.3d at 607. In context, it is clear that the quoted reference was to what the Court herein calls *Pickering* balancing.

(Fletcher, J., concurring in part and dissenting in part) ("In order to conduct the *Pickering* balancing analysis, we must weigh evidence regarding [a plaintiff's] and his employer's relative interests; such weighing is inappropriate, if not impermissible, at the dismissal stage."). This case law makes sense when considering that *Pickering* balancing frequently asks a court to go beyond the pleadings and to engage in fact finding that is impermissible in evaluating a motion to dismiss brought under Rule 12(b)(6). *See e.g., Brown*, 124 F.4th at 1269 ("Without discovery to uncover facts beyond their personal knowledge, the plaintiff cannot allege facts addressing both sides of the scale for a *Pickering* balancing analysis."); *London v. Orange Cnty.*, Fla., No. 608CV1773ORL35KRS, 2009 WL 10706171, at *5 (M.D. Fla. July 17, 2009) ("However, the *Pickering* balance, though a question of law, would require examining evidence outside the pleadings, which the Court cannot do on a 12(b)(6) motion." (internal citation omitted)); *Kelly v. Huntington Union Free Sch. Dist.*, 675 F. Supp. 2d 283, 298 (E.D.N.Y. 2009) (noting that *Pickering* balancing is a "fact-sensitive" inquiry).[19]

In asking the Court to conduct *Pickering* balancing here—and in particular in asking the Court to evaluate the State's interest (i.e., MTSU's interest) under that balancing test—Defendants effectively ask the Court to go well beyond what the Court can consider here: the (operative)

---

[19] Although some of the decisions quoted by the Court above suggest that it is always impermissible to conduct *Pickering* balancing at the motion-to-dismiss stage, the Court does not discern that under Sixth Circuit precedent it is categorically impermissible to conduct *Pickering* balancing at this stage. Indeed, in *Perry* the Sixth Circuit noted that in "many" (as opposed to all) cases, *Pickering* balancing cannot be conducted at the 12(b)(6) stage due to "inadequate factual development," *Perry*, 209 F.3d at 607, thereby implying that there are in fact cases—in particular, cases with adequate factual development—where it is appropriate to conduct *Pickering* balancing at the motion-to-dismiss stage. And district courts in the Sixth Circuit in some cases have conducted *Pickering* balancing at the motion-to-dismiss stage. *See e.g., Crawford v. Columbus State Cmty. Coll.*, 196 F. Supp. 3d 766, 777 (S.D. Ohio 2016) (noting that in "many cases the [*Pickering*] balancing test cannot be performed on a 12(b)(6) motion due to inadequate factual development," but that "this is not such a case." (internal quotation marks and citations omitted)). Nevertheless, for the reasons explained more fulsomely below, the Court does not discern that the instant case is one in which *Pickering* balancing is appropriately conducted at the motion-to-dismiss stage.

pleading[20] (i.e., the Amended Complaint) and the exhibits thereto (the Kelley Letter (Doc. No. 25-1), the copy of Policy 103 (Doc. No. 25-2), and the copy of Policy 851 (Doc. No. 25-3)).[21] Defendants in effect request that the Court stray far from that content in order to engage in the type of fact finding and weighing of evidence that is impermissible when considering a Rule 12(b)(6) motion to dismiss. Indeed, in support of their argument that "MTSU has a substantial interest in avoiding disruption on campus [that could result from the At-Issue Posts]," (Doc. No. 28 at 17), Defendants point the Court to various webpages on MTSU's website, namely webpages displaying, respectively, the mission statement of MTSU's Office of Student Care and Conduct (*id.* at 18, 19), an MTSU policy governing student conduct (*id.* at 18), MTSU's mission statement (*id.* at 21), and MTSU's code of conduct. (*Id.* at 21).[22] In other words, Defendants' arguments ask

---

[20] "A 'pleading,' as defined by Fed. R. Civ. P. 7(a) is: '(1) a complaint; (2) an answer to a complaint; (3) an answer to a counterclaim designated as a counterclaim; (4) an answer to a crossclaim; (5) a third-party complaint; (6) an answer to a third-party complaint; and (7) if the court orders one, a reply to an answer.'" *Escue v. Bradley Power & Air, LLC*, No. 214CV02372JTFTMP, 2014 WL 12607110, at *1 (W.D. Tenn. Nov. 10, 2014). In this case, Defendants filed the Motion in lieu of an answer to the Amended Complaint, and so the Amended Complaint is the sole (operative) pleading in this action.

[21] Consistent with the Court's discussion in a footnote above, the Court herein treats the Kelley Letter (Doc. No. 25-1), the copy of Policy 103 (Doc. No. 25-2) and the copy of Policy 851 (Doc. No. 25-3), as exhibits attached to the Amended Complaint.

[22] The Court notes that the particular webpages referred to by Defendants in the Opening Brief are neither mentioned in the Amended Complaint, nor seem to be central to Plaintiff's claim so as to be appropriately considered by the Court in evaluating the instant Motion without transforming the Motion into a motion for summary judgment.

Defendants argue that the Court can consider these webpages in ruling on the Motion because, according to Defendants, the Court is able "*sua sponte* to take judicial notice of the contents of a .edu website or a government website[.]" (Doc. No. 28 at 11 n.2 (quoting *Jones v. Sexton*, No. 3:23-cv-1033, 2025 WL 3000203, at *3 n.6 (M.D. Tenn. Oct. 4, 2025) (Richardson, J.))). It is true, as the undersigned has previously noted, *see Jones*, 2025 WL 3000203, at *3 n.6, that the Court is able *sua sponte* to take judicial notice of the contents of a .edu website or a government website when considering a motion to dismiss, *see also Bradley v. Jefferson Cnty. Pub. Schs.*, 595 F. Supp. 3d 552, 558 (W.D. Ky. 2022) ("Courts may take judicial notice of information posted on official public websites of government agencies in addressing a Rule 12(b)(6) motion to dismiss."), and the webpages that Defendants reference are .edu websites.

With that said, although the Court may take *judicial notice* of the webpages referred to by Defendants, this merely allows the Court to take notice of only the fact that the webpages *exist(ed)* and that the webpages *say what they say*, and not also notice of facts supposedly suggested by or inferable from the existence or

the Court to go beyond the pleading (and the attachments thereto that are cognizable herein) to find that *Pickering* balancing warrants dismissal of Plaintiff's claim. This, the Court declines to do. Indeed, the Sixth Circuit—in considering an appeal of the dismissal of an action (a dismissal that was based, in part, on the district court's finding that a plaintiff failed *Pickering* balancing at the motion-to-dismiss stage)—reversed the district court's dismissal (in its entirety and also specifically to the extent that the dismissal was based on the district court's application of *Pickering* balancing), and admonished the district court for "going beyond the pleadings and engaging in fact finding" in order to perform *Pickering* balancing at the motion-to-dismiss stage. *Perry*, 209 F.3d at 607.

Moreover, an examination of the Amended Complaint and the exhibits attached to the Amended Complaint—i.e., the Kelley Letter (Doc. No. 25-1), the copy of Policy 103 (Doc. No. 25-2), and the copy of Policy 851 (Doc. No. 25-3)—,which for the reasons explained in the

content of the webpage. *See Corl v. Kenan Advantage Grp. Inc.*, No. 3:20-CV-00503, 2020 WL 7694967, at *3 (M.D. Tenn. Dec. 28, 2020) (Richardson, J.) ("The use, in this context, of a document in the public record is proper only for the fact of the document's existence, not for the truth of the matters asserted in the document." (citing *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005))); *Ji v. U.S. Citizenship & Immigr. Servs.,* No. 24-CV-4815-SJB, 2026 WL 171879, at *4 (E.D.N.Y. Jan. 22, 2026) (observing, when considering a 12(b)(6) motion to dismiss, that "[although] the Court may take judicial notice of public records and information published on government websites, the Court 'may not rely on the document for the truth of the matters asserted therein.'" (citing *James v. Bradley*, 808 F. App'x 1, 3 (2d Cir. 2020)). *Cf. Passa*, 123 F. App'x at 697 (noting, when reviewing the decision of a magistrate judge that granted a motion to dismiss by relying, in part, on information published on a municipal website, that although courts may take judicial notice of documents in the "public record," most Courts of Appeals to have considered the issue have noted that "the use of such documents is proper only for the fact of the documents' existence, and not for the truth of the matters asserted therein."). *Cf. Patriot Angels Consulting Corp. v. Veterans of Foreign Wars of the United States*, No. 3:24-CV-00087, 2026 WL 625680, at *8 (M.D. Tenn. Mar. 5, 2026) (Richardson, J.) ("[T]hough having found it proper to take judicial notice of the Letters, the Court will not consider the Letters for the truth of the matters asserted therein. Rather, the Court will consider only the existence of the Letters and what the Letters *say* (to the extent that the bare fact of what they say is relevant)."). The Court does not discern—and Defendants identify no authority to suggest—that the Court's ability to take judicial notice of these webpages extends to permitting the Court to undertake a freewheeling fact-finding exercise based on what these webpages say. So, even if the Court may take judicial notice of the webpages referred to by Defendants, such notice does not permit the Court to engage in *Pickering* balancing at this stage.

footnote above the Court may consider in its evaluation of the Motion,[23] reveals that the instant action is not one of those "rare cases" where Plaintiff has provided an adequate basis to perform *Pickering* balancing at the motion-to-dismiss stage. *Craig v. Rich Tp. High Sch. Dist. 227*, 736 F.3d 1110, 1121 (7th Cir. 2013) (noting that it is a "rare case" there is, at the pleading stage, "an adequate basis to perform the *Pickering* balancing test." (cleaned up)). In particular, based on the Amended Complaint's allegations and the exhibits to the Amended Complaint, the Court does not discern that it can adequately evaluate the State's interest (i.e., MTSU's interest) under the *Pickering* balancing test. Of course, this is not to ding Plaintiff for not alleging facts sufficient for the Court to evaluate the State's interest under the *Pickering* balancing test. Indeed, as the Tenth Circuit recently noted, making a point with which the Court agrees, a "plaintiff cannot reasonably be expected to allege facts that support the government's burden [under *Pickering* balancing]." *Brown*, 124 F.4th at 1269.

The upshot is that given (1) the particular stage of this litigation, (2) the particular arguments raised by Defendants in the briefing on the Motion, and (3) the Amended Complaint's allegations as well as exhibits attached to the Amended Complaint, the Court finds that it is unable conduct *Pickering* balancing. So, the Court joins a long line of federal courts that have declined to conduct *Pickering* balancing on a particular motion to dismiss. *See e.g., Joyner*, 2008 WL 1844319, at *4 ("The Court is further unconvinced [] that it would be appropriate in this matter to apply the *Pickering* balance test without a more developed record."); *Lott v. Andrews Ctr.*, 259 F. Supp. 2d 564, 571 (E.D. Tex. 2003) ("At this stage of the litigation, a motion to dismiss, it is

---

[23] Consistent with an earlier footnote, the Court may consider the Kelley Letter (Doc. No. 25-1), the copy of Policy 103 (Doc. No. 25-2) and the copy of Policy 851 (Doc. No. 25-3) in its evaluation of the Motion without transforming the Motion into a motion for summary judgment. But as noted earlier, the Court does not discern how either Policy 103 or Policy 851 is germane to Plaintiff's claim in this action or to a proper analysis of the Motion.

premature for the Court to apply the *Pickering* balancing test."); *Gala v. City of New York*, 525 F. Supp. 3d 425, 431-32 (E.D.N.Y. 2021) (collecting cases finding that "it is inappropriate to resolve the *Pickering* analysis on a motion to dismiss"). Accordingly, the Court declines to dismiss this action based on any purported State interest (i.e., the interest of MTSU) outweighing Plaintiff's First Amendment interest in the At-Issue Posts. Such a declination is without prejudice to Defendants again raising the issue of *Pickering* balancing at a later stage of this litigation, for instance in a motion for summary judgment.[24]

### 2. *Qualified Immunity*

That takes the Court to the second argument raised by Defendants in the Opening Brief. Therein, Defendants contend that they are entitled to qualified immunity because (according to Defendants) even if Plaintiff's speech in the At-Issue Posts was constitutionally protected, this "was not clearly established when [] McPhee and Kelley terminated [Plaintiff's] employment." (Doc. No. 28 at 24).[25] And so, according to Defendants, Count I (the sole claim in this action) should be dismissed to the extent that it is brought against Defendants in their individual capacities. (*Id.* at 27).[26] Below, the Court will first provide an overview of the doctrine of qualified immunity,

---

[24] At one point in her Response, Plaintiff contends that the Court should eschew *Pickering* balancing not on the grounds the Court has just stated above, but on the grounds that (according to Plaintiff) "Defendants terminated Plaintiff's employment based on the viewpoint of her speech, which is not a State interest under *Pickering*." (Doc. No. 31 at 18). However, Plaintiff then goes on to argue that the Court "should find that Defendants' nonexistent interest in viewpoint discrimination renders their side of the *Pickering* balance empty at this stage." (*Id.* at 18). This suggests that Plaintiff, rather than wishing for the Court to eschew *Pickering* balancing entirely, wishes for the Court to engage in *Pickering* balancing and find that the State (i.e., MTSU) has *no interest* such that *Pickering* balancing tilts decisively in Plaintiff's favor. The Court declines to grant that wish but notes that this is not to Plaintiff's detriment, given that the Court is permitting Plaintiff's lawsuit to survive the Motion anyway.

[25] The Court has altered the capitalization in this quotation.

[26] As discussed in a footnote above, qualified immunity would not lead to the dismissal of Count I to the extent Count I is brought against Defendants in their *official capacities*. *See e.g., City of Sidney*, 364 F.3d

---

then discuss why, in the Court's view, it is not appropriate to evaluate the defense of qualified immunity on the instant Motion.

a. Qualified Immunity Generally

As noted above, the defense of qualified immunity properly can be asserted under Fed. R. Civ. P. 12(b)(6). *See, e.g., Peatross*, 818 F.3d at 240. The analysis of a claim of qualified immunity involves either one or two steps (or "prongs"), each of which involves the court answering a particular question. The "first step is to determine if the facts alleged make out a violation of a constitutional right. The second is to ask if the right at issue was 'clearly established' when the event occurred such that a reasonable officer would have known that his conduct violated it."[27]*Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013) (citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). Although these two questions may be addressed in either order, both questions must be answered in the affirmative for a plaintiff's claim to proceed. *Id.* (citing *Pearson*, 555 U.S. at 236). So if either question is answered in the negative, the court may dismiss the claim without answering the other question. *Kenjoh Outdoor, LLC v.*

---

at 752 n.4 ("the defense of qualified immunity [] is not available to officers who have been sued in their official capacities.").

[27] As *Martin*'s language here suggests but does not make entirely clear, the issue here is actually not just whether the right allegedly violated was clearly established. The issue is actually whether it was clearly established that the official's alleged conduct violated a constitutional right. *See, e.g., Mullenix v. Luna*, 577 U.S. 7, 11 (2015) ("A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." ) (internal quotation marks omitted); *Beck v. Hamblen Cnty., Tennessee*, 969 F.3d 592, 598 (6th Cir. 2020) ("To overcome a qualified-immunity defense, § 1983 plaintiffs must show two things: that government officials violated a constitutional right and that *the unconstitutionality of their conduct was clearly established* when they acted." (emphasis added)). And to answer that question, obviously, it is necessary *but not sufficient* that the right allegedly violated was clearly established.

In sum, the customary framing of the second element is somewhat imprecise because the question ultimately is not just whether *the right allegedly violated was clearly established.* Nevertheless, like other courts, the Court herein at times will use the shorthand reference to the "right" being clearly established without referring explicitly to the requirement that it be clear that the official's conduct violated such right.

*Marchbanks*, 23 F.4th 686, 694 (6th Cir. 2022) ("If one prong is decisive, we need not to [sic] consider the other.").

"Once the qualified immunity defense is raised, the burden is on the plaintiff to demonstrate that the officials are not entitled to qualified immunity." *Silberstein v. City of Dayton*, 440 F.3d 306, 311 (6th Cir. 2006); *see also Cahoo v. SAS Analytics Inc.*, 912 F.3d 887, 898 (6th Cir. 2019) ("'[T]he plaintiff bears the burden of showing that an officer is not entitled to the defense of qualified immunity.'" (quoting *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016))). To survive the motion to dismiss on qualified-immunity grounds, a plaintiff must allege facts that "plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established [by] law at the time, such that a reasonable [official] would have known that his conduct violated that right." *Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

As noted above, the particular arguments raised by Defendants as to qualified immunity go to qualified immunity's clearly-established prong.[28] The inquiry into whether a right was clearly established must be conducted "in light of the specific context of the case." *Saucier v. Katz*, 533 U.S. 194, 201 (2001).[29] "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right . . . [and] in the light of preexisting law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *see also Edwards v. Williams*, 170 F. Supp. 2d 727, 735 (E.D. Ky. 2001) (explaining that

---

[28] Had Defendants chosen to challenge (additionally or alternatively) the first, violation-of-a-constitutional-right prong, that challenge would have failed out of hand. This is because the Court at the instant stage cannot determine even whether there was a constitutional violation (clearly established or otherwise) given that (as discussed above), the Court at the current stage cannot conduct the *Pickering* balancing necessary to answer that question.

[29] It is clear to the Court that the analysis of whether a *right was violated*—i.e., whether the right alleged by the plaintiff to have been violated *actually* was violated—likewise would have to be conducted in light of the specific context of the case as well.

a plaintiff must show "that any officials in the defendants' positions, measured objectively, would have clearly understood that they were under an affirmative duty to refrain from the conduct."). While it is not necessary for a case to be "directly on point" for a right to be clearly established, "existing precedent must have placed the statutory or constitutional question beyond debate." *See Mullenix v. Luna*, 577 U.S. 7, 12 (2015); *Pike v. Hester*, 891 F.3d 1131, 1141 (9th Cir. 2018) (explaining that the "clearly established" prong does not require an "exact factual match"). In other words, "[i]n an obvious case, [general] standards can clearly establish the [right], even without a body of relevant case law." *Flying Dog Brewery, LLLP v. Michigan Liquor Control Comm'n*, 597 F. App'x 342, 353 (6th Cir. 2015).

Nevertheless, dismissal at the motion-to-dismiss stage based on qualified immunity is generally inappropriate, as the Sixth Circuit explained not long ago (in an unpublished opinion, but one relying exclusively on published opinions):

> Although a defendant's "entitle[ment] to qualified immunity is a threshold question to be resolved at the earliest possible point, that point is usually summary judgment and not dismissal under Rule 12." *Wesley v. Campbell*, 779 F.3d 421, 433–34 (6th Cir. 2015) (alteration in original) (quotation marks and citations omitted). "The reasoning for our general preference is straightforward: 'Absent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is "obvious" or "squarely governed" by precedent, which prevents us from determining whether the facts of this case parallel a prior decision or not' for purposes of determining whether a right is clearly established." *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) (quoting *Evans-Marshall v. Bd. of Educ. of Tipp City Exempted Vill. Sch. Dist.*, 428 F.3d 223, 235 (6th Cir. 2005) (Sutton, J., concurring)). Therefore, it is generally inappropriate for a district court to grant a 12(c) motion based on qualified immunity. *Wesley*, 779 F.3d at 433; *see also Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016).

*Kilnapp v. City of Cleveland*, No. 22-4059, 2023 WL 4678994, at *3 (6th Cir. July 21, 2023).

However, clarifying its oft-repeated statement that granting a Rule 12 motion based on qualified-immunity grounds is "generally inappropriate," the Sixth Circuit has warned that this "general statement is at best imprecise," *Crawford v. Tilley*, 15 F.4th 752, 763 (6th Cir. 2021), and

has noted that this cautionary proviso is really directed at decisions that rest on "qualified immunity's clearly established prong."[30] *Id.* The Court keeps this caveat in mind.

      b.  Qualified Immunity in this Action

For the reasons explained below, at this stage of the case, the Court does not discern that it can resolve the qualified-immunity defense raised by Defendants.

As an initial matter, the Court notes that in the context of qualified immunity and First Amendment retaliation claims implicating *Pickering* balancing, courts in the Sixth Circuit evaluate whether a right was clearly established by asking whether "an employer in the position of the defendants at the time of the adverse job action, measured objectively, could have disagreed as to [] where the *Pickering* scale, with all of the parties' competing interests in the balance, would ultimately come to rest." *Akridge v. Wilkinson*, 351 F. Supp. 2d 750, 767 (S.D. Ohio 2004), *aff'd,* 178 F. App'x 474 (6th Cir. 2006);[31] *Guercio v. Brody*, 911 F.2d 1179, 1185 (6th Cir. 1990) (evaluating whether a defendant, in that case a federal bankruptcy judge, was entitled to qualified immunity by considering whether "judges of reasonable competence in the position of [the defendant] at the time here in issue could have disagreed upon whether [plaintiff's] right to exercise her first amendment right to free speech without being terminated from her employment was outweighed by the [State's] interest"); *Higbee v. E. Michigan Univ.*, 399 F. Supp. 3d 694, 705

---

[30] The court here seemed to be saying that the general rule—that a qualified-immunity defense generally cannot be conclusively established on a 12(b)(6) motion to dismiss—is based at least primarily on the rationale that on such a motion it would be premature to decide *whether the constitutional right allegedly violated was not "clearly established."*

   The Court notes, however, that in its view the same could be said for the issue of whether there was a violation of a constitutional right *at all* (whether one clearly established or not clearly established), because such issue likewise might tend to be inadequately framed by the information appropriately considered on a motion to dismiss. Nevertheless, the Court heeds the Sixth Circuit's observation on this point.

[31] Of note, in *Akridge v. Wilkinson,* 178 F. App'x 474, 481 (6th Cir. 2006) the Sixth Circuit seems to have impliedly affirmed the above-quoted test from *Akridge v. Wilkinson*, 351 F. Supp. 2d 750, 767 (S.D. Ohio 2004), which in turn was derived from *Guercio v. Brody*, 911 F.2d 1179 (6th Cir. 1990).

(E.D. Mich. 2019) (noting that "this is a case where objective employers would not have disagreed about where the *Pickering* scale would have come to rest" and denying qualified immunity to defendants on that basis), *case dismissed,* No. 19-1751, 2019 WL 5079254 (6th Cir. Aug. 7, 2019).[32] Put another way, courts consider whether "the law was clearly established" in this context by asking whether "[a state employee] would have known [at the time of the adverse employment action] [that a] [p]laintiff's interests in speaking on the matter of public concern outweighed the [State's] interests." *Handy-Clay v. City of Memphis*, No. 10-2927-STA-TMP, 2013 WL 5305239, at *20 (W.D. Tenn. Sept. 19, 2013). The upshot is that if an employer—finding itself in the position of defendants at the time of the adverse employment action—could reasonably[33] (measured objectively) have disagreed as to whether plaintiff's interests in speaking outweighed the State's interests, or if the employer, measured objectively, should not have known that a plaintiff's interests in speaking on the matter of public concern outweighed the State's interests, then

---

[32] In evaluating whether defendants are entitled to qualified immunity in a First Amendment retaliation context because a right was (or was not) clearly established, courts also sometimes ask whether "an employer in the position of the defendants at the time of the adverse job action, measured objectively, could have disagreed as to [] whether and to what extent the speech was a matter of public concern." *Akridge*, 315 F. Supp. 2d at 767. Given that the issue of whether the At-Issue Posts involved a matter of public concern has not been raised by Defendants, the Court will not evaluate that issue herein.

[33] Although the case law is not always explicit on this point, it is clear that the inquiry here is asking what a hypothetical objectively *reasonable* employer would have believed or thought. *See, e.g., Akridge*, 315 F. Supp. 2d at 767-68 (framing qualified immunity's clearly-established inquiry in terms of what, measured objectively, an employer would have believed and noting that because "reasonable officials in defendants' position could have questioned whether and to what extent plaintiff's speech was protected by the First Amendment," defendants were entitled to qualified immunity); *Handy-Clay*, 2013 WL 5305239, at *15 ("the Court must decide whether reasonable officials could have disagreed about whether Plaintiff's free speech interests outweighed the [State's] interests in efficiency."); *Guercio*, 911 F.2d at 1186, 1189 (examining whether "[officials] of reasonable competence in the position of [the defendant] [] could have disagreed upon whether [plaintiff's] right to exercise her first amendment right to free speech [] was outweighed by the [State's] interest" and noting that the clearly-established inquiry focuses on the "objective reasonableness of an official's act when viewed in light of all properly pleaded facts.").

defendants would be entitled to qualified immunity because the right at issue would not have been clearly established.

As noted earlier, Defendants argue that they are entitled to qualified immunity because (according to Defendants themselves) even if Plaintiff's speech in the At-Issue Posts was constitutionally protected, that this speech was constitutionally protected "was not clearly established when [] McPhee and Kelley terminated [Plaintiff's] employment." (Doc. No. 28 at 24).[34] On this point, Defendants specifically argue that "it must have been clearly established 'where the *Pickering* scale [] would ultimately come to rest.'" (Doc. No. 28 at 25 (quoting *Guercio*, 911 F.2d at 1189)), and that Plaintiff must "direct the Court to case law making it clear that [] McPhee and Kelley got the *Pickering* balance wrong." (Doc. No. 28 at 26 (citing *Guercio*, 911 F.3d at 1185)). In other words, Defendants argue that they are entitled to qualified immunity because it was not clearly established that the *Pickering* balancing in this case tilted in Plaintiff's favor.

At this stage of the litigation, however, the Court does not believe that it can evaluate this argument. That is, the Court does not believe that it can determine whether qualified immunity applies to Defendants in this case at this particular stage of the case. Why? Because as already discussed above, the Court has found that it cannot conduct *Pickering* balancing at this stage of the litigation. And it would be incongruous with the foregoing conclusion (to say nothing of presenting substantial and perhaps insurmountable analytical hurdles) for the Court to nevertheless consider whether it was *clearly established* that *Pickering* balancing tilted against Plaintiff before the Court is actually able to conduct *Pickering* balancing in the first place.

---

[34] The Court has altered the capitalization in this quotation.

So, the Court finds that this is one of the many cases where it is "inappropriate for a district court to grant a 12(b)(6) motion to dismiss on the basis of qualified immunity," *Wesley*, 779 F. 3d at 433, particularly given that Defendants have raised the defense of qualified immunity in terms of qualified immunity's clearly-established prong. *See Crawford*, 15 F.4th at 763; *Guertin v. State*, 912 F.3d 907, 917 (6th Cir. 2019) ("[a]bsent any factual development beyond the allegations in a complaint, a court cannot fairly tell whether a case is 'obvious' or 'squarely governed' by precedent," and this "prevents [the court] from determining whether the facts of th[e] case parallel a prior decision or not for purposes of determining whether a right is clearly established." (internal quotation marks omitted)).[35] And so, the Court declines to dismiss Plaintiff's sole claim in this action (Count I)—insofar as this claim is brought against Defendants in their *individual capacities*—based on Defendants (purportedly) being entitled to qualified immunity. Such declination is without prejudice to Defendants again raising the defense of qualified immunity at a later stage of this litigation—such as in a motion for summary judgment.[36]

---

[35] In their Reply, Defendants argue that "Tennessee federal courts consistently grant qualified immunity in *Pickering* cases based on the context-intensive [*Pickering*] balancing analysis," and cite *Gruber v. Bruce*, 643 F. Supp. 3d 824, 842 (M.D. Tenn. 2022), and *Handy-Clay v. City of Memphis*, No. 10-2927-STA-TMP, 2013 WL 5305239, at *20 n.130 (W.D. Tenn. Sept. 19, 2013) in support of this proposition. (Doc. No. 35 at 5-6). Defendants' argument is unavailing. First, the Court notes that it is not convinced that citations to a mere two cases actually shows that something is done *consistently.* Second and more importantly, neither the decision in *Gruber* nor the decision in *Handy-Clay* addressed motions to *dismiss*—instead both decisions resolved motions for *summary judgment*. In other words, neither *Gruber* nor *Handy-Clay* convince the Court that now (rather than later) is the appropriate time in this action to resolve the issue of qualified immunity.

[36] Defendants argue that "[q]ualified immunity requires *immediate* dismissal of" the sole claim (Count I) brought in this action to the extent that that claim is brought against Defendants in their individual capacities. (Doc. No. 28 at 27 (emphasis added)). Defendants argue in particular:

> Qualified immunity shields state officials "not merely from liability, but also from litigation and discovery." *Myers v. City of Centerville*, 41 F.4th 746, 758 (6th Cir. 2022). It follows that, as a defense against "suit rather than [just] liability," qualified immunity "must 'be resolved prior to discovery'" rather than afterwards, whenever possible. *Siefert v. Hamilton Cnty.*, 951 F.3d 753, 762 (6th Cir. 2020) (quoting *Pearson v. Callahan*, 555

U.S. 223, 231-32 (2009), and adding emphasis). If it is "properly raised prior to discovery, the district court has" not just the option but the "duty to address it." *Summers v. Leis*, 368 F.3d 881, 886 (6th Cir. 2004) (citing *Skousen v. Brighton High Sch.*, 305 F.3d 520, 522 (6th Cir. 2002)).

(Doc. No. 28 at 27). As an initial matter, *Siefert* does not stand for the proposition that a qualified-immunity defense *must* categorically be resolved prior to discovery. The portion of *Siefert* relied on by Defendants provides:

> Defendants may raise the qualified immunity defense in response to a 12(b)(6) motion because it is "an immunity from suit rather than a mere defense to liability." *Pearson*, 555 U.S. at 231, 129 S.Ct. 808 (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)). That is why some claims must "be resolved prior to discovery." *Id.* at 231-32, 129 S.Ct. 808 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 n.2, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (emphasis added)).

*Siefert*, 951 F.3d at 761-62. In other words, *Siefert* stands for the proposition that *sometimes* (i.e., not *always*) a district court must resolve a qualified-immunity defense if that defense is raised prior to discovery—for instance via a 12(b)(6) motion to dismiss. *Siefert*, 951 F.3d at 762 (noting that "despite the general preference to save qualified immunity for summary judgment, sometimes it's best resolved in a motion to dismiss."). However, for the reasons described herein, the Court discerns that *this* is not an instance where the qualified-immunity defense should be (let alone *must* be) resolved prior to discovery. Furthermore, the Court notes that Defendants' reliance on *Summers* is misplaced. The portion of *Summers* relied on by Defendants provides:

> This Court has held on multiple prior occasions that, when faced with a motion based on qualified immunity, a district court can not avoid ruling on the issue. *See e.g., Skousen v. Brighton High School*, 305 F.3d 520 (6th Cir. 2002). In the case of *Skousen v. Brighton High School*, we concluded that a district court committed legal error in dismissing a motion for summary judgement based on qualified immunity solely because discovery was not complete. *See Skousen*, 305 F.3d 520 (6th Cir. 2002). We held that, because the defense of qualified immunity is a threshold question, if the defense is properly raised prior to discovery, the district court has a duty to address it. *Id.*
>
> > Rather than dismiss the [summary judgment] motion because discovery was not complete, the district court was required to determine—prior to permitting further discovery—whether [Plaintiff's] complaint alleged the violation of a constitutional right at all, and if so, whether that right was clearly established at the time of the alleged violation.
>
> *Id.* at 527. Only after the court inquires into whether any facts material to Plaintiff's claims are genuinely at issue, and only upon a finding that material facts are in fact in dispute is a court at liberty to hold a motion for summary judgment in abeyance pending additional discovery.

*Summers*, 368 F.3d at 886. *Summers* is inapplicable to the instant action for two reasons. First, *Summers* states that "because the defense of qualified immunity is a threshold question, if the defense is *properly* raised prior to discovery, the district court has a duty to address it." *Id.* (emphasis added). As explained in the body of this memorandum opinion, the Court concludes that the defense of qualified immunity was

CONCLUSION

For the reasons set forth above, the Motion (Doc. No. 27) will be **DENIED** in its entirety. Given this denial, the pending motion to stay discovery (Doc. 39), wherein Defendants seek a stay of discovery pending the resolution of the Motion, will be **DENIED** as moot.

The Court notes that herein it is neither opining on whether it is likely that Plaintiff will prevail on the merits of her claim; nor opining on the advisability (considering the position she then occupied at MTSU) of the speech in which Plaintiff allegedly engaged. Instead, the Court is merely explaining that the particular bases for dismissal of this action that Defendants have raised via the Motion are not appropriately considered *in this particular case* at *this particular stage of the litigation*.

An appropriate accompanying order will be entered.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

raised too early in this case via the Motion; the Court perceives that this disqualifies the defense here as being raised "properly" via the Motion, and Defendants have done nothing to disabuse the Court of that conclusion. And second, *Summers* did not address what a district court must do when faced with a qualified-immunity defense raised via a motion to dismiss. Rather, *Summers* discussed the defense of qualified-immunity specifically in the context of motions for *summary judgment*. In other words, neither *Siefert* nor *Summers* convinces the Court that it is erring by declining to address qualified immunity substantively at this juncture.

Finally, the Court wishes to note one more thing about qualified immunity. The Sixth Circuit has held that "[t]imely assessment of a qualified immunity defense is important because 'qualified immunity shields government defendants not merely from liability, but also from litigation and discovery.'" *Batton v. Sandusky Cnty., Ohio*, No. 23-3168, 2024 WL 1480522, at *2 (6th Cir. Apr. 5, 2024) (quoting *Myers v. City of Centerville, Ohio*, 41 F.4th 746, 758 (6th Cir. 2022)). However, in this action, even if the Court were to conclude at *this stage* that qualified immunity applied to Defendants, this would not entirely protect Defendants from "litigation and discovery." Why? Because the sole claim in this action (Count I) is brought against Defendants in *both* their individual *and* official capacities, and qualified immunity "is a doctrine applicable only in the context of individual-capacity suits." *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 219 (6th Cir. 2011). In other words, even if qualified immunity applied to Defendants, this action would continue against Defendants in their *official capacities*, and thus the Court discerns that some of the concerns driving courts to resolve a qualified-immunity defense at the earliest possible juncture of a given litigation are inapplicable to the instant case.